UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| U.S. ENERCORP, LTD., | § | |
| | § | |
| Plaintiff, | § | Cv. No. SA:12-CV-1231-DAE |
| | § | |
| vs. | § | |
| | § | |
| SDC MONTANA BAKKEN | § | |
| EXPLORATION, LLC; VAL VERDE | § | |
| INVESTMENTS, LLC; AND RINGO | § | |
| SHAPIRO, | § | |
| | § | |
| Defendants. | § | |

ORDER: (1) GRANTING IN PART AND DENYING IN PART DEFENDANTS'
MOTION TO DISMISS; (2) GRANTING PLAINTIFF LEAVE TO AMEND

On July 22, 2013, the Court heard oral argument on the Motion to Dismiss filed by Defendants SDC Montana Bakken Exploration, LLC, Val Verde Investments, LLC, and Ringo Shapiro (collectively, "Defendants").  (Doc. # 16.) Amy Davis, Esq., and Corey Wehmeyer, Esq., appeared on behalf of Plaintiff U.S. Enercorp, Ltd.; Olivier Taillieu, Esq., appeared on behalf of Defendants.  After careful consideration of the Motion and the supporting and opposing memoranda, and in light of the parties' arguments at the hearing, the Court, for the reasons that follow, **GRANTS IN PART AND DENIES IN PART** Defendants' Motion to Dismiss (doc. # 16) and **GRANTS PLAINTIFF LEAVE TO AMEND**.

BACKGROUND

Plaintiff U.S. Enercorp ("Enercorp") is a Texas-based oil and gas exploration and production company.  (Doc. # 13 ("FAC") ¶¶ 2, 9.)  In 2011, seeking to acquire oil and gas leases in Northern Montana, Enercorp contracted with SDC Montana Consulting, LLC, and SDC Montana, LLC (collectively referred to herein as "SDC Montana Consulting"), who had an established presence in Montana.  (Id. ¶ 10.)[1]

Pursuant to the contracts between Enercorp and SDC Montana Consulting, the latter was obligated to acquire and deliver to Enercorp oil, gas, and mineral leases in certain parts of Montana, which Enercorp planned to sell to a third party.  (FAC ¶ 11.)  Soon thereafter, Southwestern Energy Production Company ("SEPCO") expressed interest in the Montana leases, and Enercorp began structuring a contract to deliver them to SEPCO.  (FAC ¶ 13; Resp. ¶ 6.)

Enercorp alleges that, at the same time that it was attempting to structure a deal with SEPCO, Defendants "approached SDC Montana Consulting" and encouraged it "not to perform under its contracts" and "to only perform on terms that were different from and less favorable to Enercorp than the terms

---

[1] Despite the very similar names, the SDC Montana Consulting entities are wholly distinct from and unrelated to Defendant SDC Montana Bakken Exploration, LLC, which is an entity controlled by Defendant Ringo Shapiro.  (Resp. ¶ 3.)  Shapiro also owns Defendant Val Verde Investments, LLC, a California limited liability company.  (Doc. # 16 ("Mot.") at 2.)

actually agreed to in writing."  (Id.)  By "fraudulently misrepresent[ing] that a

'credit facility' existed that required the [Montana] leases for collateral, when in

fact no such facility ever existed," Defendants induced SDC Montana Consulting

to make "fraudulent assignments of oil, gas, and mineral leases" to Montana

Bakken and Val Verde.  (Id.)  Plaintiff allege that Defendants "knew [that the

leases] had already been assigned to Enercorp pursuant to [the contracts]" and that,

"[i]n many cases," Defendants fraudulently acquired and recorded assignments of

those same leases later in time "on top of Enercorp's [assignments]."  (Id.;

Resp. ¶ 4.)

   SEPCO wanted to purchase all the leases that Enercorp had obtained

from SDC Montana Consulting and was "avers[e] to any deal that was not

completely clean."  (FAC ¶ 13.)  Accordingly, Plaintiffs allege that Defendants—

now armed with fraudulent assignments of those leases—were able to "extort[]

their way into Enercorp's deal with [SEPCO]."  (Id.)  Knowing that SEPCO would

back out of the deal if it learned of title disputes, Defendants allegedly "refused to

clear title to the leases Enercorp already owned and intended to deliver to

[SEPCO]."  (Id.)  In addition, Defendants allegedly "threatened to contact SEPCO

and interfere with Enercorp's deal if [their] unlawful demands were not appeased."

(Id.)  Enercorp does not indicate what these "unlawful demands" were.

Enercorp, hoping to prevent its deal with SEPCO from falling apart, negotiated a Collaboration Agreement with Defendants, SDC Montana Consulting, and JL Resources, LLC ("Collaboration Agreement"). (Id. ¶ 13.) The main objective of this agreement, which was executed on April 13, 2012, was to resolve any title issues among the parties so that the deal with SEPCO could go forward. (Id.) To wit, the Collaboration Agreement provides:

> Given the stated purpose of [SEPCO] to deal with the Leases on simplified terms and with a single contracting Party, and to promote the marketability of the Leases, the Parties acknowledge and agree that the simplification of matters of title to the Leases and the elimination of all encumbrances is essential. To that end each of the Parties does hereby release . . . each to the other, all . . . causes of action . . . which one party may claim against another with regard to title of the leases.

(Collaboration Agreement ¶ 6 (emphasis added).) The next section of the Collaboration Agreement clarifies the scope of this release, stating:

> Personal Claims Retained. Notwithstanding the foregoing, each of the Parties retains and does not release, any claims or causes of action for damages, losses or monetary deficiencies that any Party may have against another Party, but with all such claims being of a personal nature against a Party, and not as a claim or encumbrance against the Leases or lands included in the projects.

(Id. ¶ 7 (emphases added).)

The Collaboration Agreement "gave Enercorp the exclusive authority to conduct all necessary negotiations with [SEPCO] in order to finalize and conclude the deal," and Enercorp insists that "Defendants specifically contracted and agreed not to interfere with Enercorp's negotiations with [SEPCO]." (FAC

¶ 13.)  However, on December 10, 2012, Defendants' counsel, Olivier Taillieu, sent a letter to SEPCO alleging defects in Enercorp's title to the Montana leases and requesting that SEPCO cease making payments under its contract with Enercorp.  (Resp. ¶ 7; Mot. Ex. 7.)  Enercorp alleges that Defendants "have also made and continue to make harassing phone calls to SEPCO, further slandering Enercorp's title and interfering with Enercorp's contract with SEPCO." (FAC ¶ 15; Resp. ¶ 7.)  As a result of Defendants' actions, SEPCO "has declared a 'Title Defect'" and "is refusing to purchase certain Montana Leases it would otherwise be obligated to purchase . . . ."  (FAC ¶¶ 18, 21.)

Enercorp further alleges that, "[b]y Paragraph 12 of the Collaboration Agreement, Defendants were also obligated to return to Enercorp an instrument referred to as the March 9, 2012 Bakken Assignment (the 'Bakken Assignment'), covering certain Montana Leases."  (FAC ¶ 16.)  However, Defendants did not return the Bakken Assignment to Enercorp.  Instead, claiming that they held title to the Bakken Assignment, Defendants delivered it directly to SEPCO.  (Id.)  "The value lost under Enercorp's contract with [SEPCO] as a result of Defendants' breaches of the Collaboration Agreement exceeds $8,000,000.00," claims Enercorp.  (Id. ¶ 16.)

On November 19, 2012, Enercorp filed this lawsuit in the 166th Judicial District Court of Bexar County, Texas, bringing causes of action for

tortious interference with a contract, tortious interference with prospective business

relations, and slander of title.  (Doc. # 1-2 ¶ 8.)  On December 31, 2012,

Defendants removed the case to this Court.  (Doc. # 1.)  On January 28, 2013,

Enercorp filed an Amended Complaint.  (Doc. # 13.)  On February 11, 2013,

Defendants filed the Motion to Dismiss that is now before the Court.  (Doc. # 16.)

On February 22, 2013, Enercorp filed a Response in opposition to Defendants'

Motion.  (Doc. # 24.)  On March 1, 2013, Defendants filed a Reply.  (Doc. # 25.)

STANDARD OF REVIEW

Federal Rule of Civil Procedure 12(b)(6) authorizes dismissal of a

complaint for "failure to state a claim upon which relief can be granted."  Review

is limited to the contents of the complaint and matters properly subject to judicial

notice.  See Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322

(2007).  In cases where "the contracts [are attached to the Defendants'] motions to

dismiss, the contracts were referred to in the complaints, and the contracts are

central to the plaintiffs' claims, [a court] may consider the terms of the contracts in

assessing the motions to dismiss."  In re Katrina Canal Breaches Litig., 495 F.3d

191, 205 (5th Cir. 2007).

In analyzing a motion to dismiss for failure to state a claim, "[t]he

court accepts 'all well-pleaded facts as true, viewing them in the light most

favorable to the plaintiff.'"  In re Katrina Canal Breaches Litig., 495 F.3d at 205

6

(quoting Martin K. Eby Constr. Co. v. Dallas Area Rapid Transit, 369 F.3d 464, 467 (5th Cir. 2004)).  To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

A complaint need not include detailed facts to survive a Rule 12(b)(6) motion to dismiss.  See Twombly, 550 U.S. at 555–56.  In providing grounds for relief, however, a plaintiff must do more than recite the formulaic elements of a cause of action.  See id. at 556–57.  "The tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions," and courts "are not bound to accept as true a legal conclusion couched as a factual allegation."  Iqbal, 556 U.S. at 678 (internal quotations and citations omitted). Thus, although all reasonable inferences will be resolved in favor of the plaintiff, the plaintiff must plead "specific facts, not mere conclusory allegations." Tuchman v. DSC Commc'ns Corp., 14 F.3d 1061, 1067 (5th Cir. 1994); see also Plotkin v. IP Axess Inc., 407 F.3d 690, 696 (5th Cir. 2005) ("We do not accept as true conclusory allegations, unwarranted factual inferences, or legal conclusions.").

When a complaint fails to adequately state a claim, such deficiency should be "exposed at the point of minimum expenditure of time and money by the parties and the court." Twombly, 550 U.S. at 558 (citation omitted). However, the plaintiff should generally be given at least one chance to amend the complaint under Rule 15(a) before dismissing the action with prejudice. Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co., 313 F.3d 305, 329 (5th Cir. 2002).

DISCUSSION

Defendants insist that "[m]ost of the claims here are governed by a release" and that the others "fail because Plaintiff has failed to plead essential elements to sustain the causes of action." (Mot. at 1.) The Court addresses Enercorp's causes of action in the order in which Defendants' Motion addresses them.

I.   Slander of Title

"Slander of title is a tort action with stringent pleading and proof requirements." Pampell Interests, Inc. v. Wolle, 797 S.W.2d 392, 395 (Tex. App. 1990). A plaintiff must prove "that the defendant made a false and malicious statement, disparaging property in which the plaintiff holds an interest, and causing special damages." Id. (citing Clark v. Lewis, 684 S.W.2d 161 (Tex. App. 1984)). Moreover, "[t]he Texas Supreme Court has consistently held that a plaintiff who sues for slander of title must plead and prove the loss of a specific sale." Id. (citing

<u>Ellis v. Waldrop</u>, 656 S.W.2d 902, 905 (Tex. 1983); <u>A.H. Belo Corp. v. Sanders</u>, 632 S.W.2d 145 (Tex. 1982); <u>Shell Oil Co. v. Howth</u>, 159 S.W.2d 483, 490 (Tex. 1942)); <u>see also</u> <u>Sw. Guar. Trust Co.</u>, 981 S.W.2d 951, 954 (1998) ("Barring such proof [of loss of a specific sale], the plaintiff may not recover any damages, whether litigation expenses, interest, taxes, or otherwise.").

Enercorp alleges that it "possessed an interest in property through the oil and gas leases in . . . Montana" and that "Defendants uttered and published false and disparaging statements about Enercorp's title, including recording instruments purporting to have acquired the oil and gas leases, when Defendants knew Enercorp had already acquired title from SDC Montana Consulting, LLC." (FAC ¶ 30.)  "These statements cast doubt on the quality of Enercorp's title in the Montana Leases," insists Enercorp, "and were uttered and published with malice and without privilege, thereby causing damage to Enercorp."  (<u>Id.</u>)  "At a minimum," says Enercorp, "these damages include the sums Enercorp would have received in the sale of those leases to [SEPCO] and the development of those leases, but for Defendants' slanderous actions."  (<u>Id.</u>)

Defendants insist that Enercorp's slander-of-title claim fails because it was released by the Collaboration Agreement; because Enercorp failed to plead the loss of a specific sale; and because, "to the extent that Enercorp relies on

post-closing conduct to support its Slander of Title claim, . . . [it] fails to plead that any of Defendants' statements were 'false.'"  (Mot. at 8, 10–11.)

      A.    <u>The Release</u>

          Defendants first insist that this claim must be dismissed because it is subject to the release contained in the Collaboration Agreement.  (Mot. at 8.)  "The release specifically refers to 'causes of action . . . which one party may claim against another with regard to title of the leases,'" note Defendants.  (<u>Id.</u> (quoting Collaboration Agreement ¶ 6).)  "This language," they insist, "is clearly meant to bring 'slander of title' within the scope of the release."  (<u>Id.</u>)

          Enercorp responds that "'release' is an affirmative defense that Defendants bear the burden of proving and is not properly the subject of a motion to dismiss."  (Resp. at 10.)  Enercorp is correct: Texas law makes clear that "[r]elease is an affirmative defense, Tex. R. Civ. P. 94, where the defendant bears the burden to plead and prove the existence of an effective and valid release." <u>Barras v. Barras</u>, 396 S.W.3d 154, 170 n.5 (Tex. App. 2013) (citing <u>Williams v. Glash</u>, 789 S.W.2d 261, 264 (Tex. 1990)).

          In certain limited circumstances, a court may dismiss a claim under Rule 12(b)(6) "if a successful affirmative defense appears <u>clearly</u> on the face of the pleadings."  <u>Clark v. Amoco Prod. Co.</u>, 794 F.2d 967, 970 (5th Cir. 1986) (emphasis added).  In order to dismiss a claim on this basis, however, the validity

of the affirmative defense must essentially be unquestionable: A defendant is "not entitled to dismissal under Rule 12(b)(6) . . . unless the [plaintiffs] have 'pleaded [themselves] out of court by admitting to all of the elements of the defense.'" Smallwood v. Bank of Am., 2012 WL 32654, at *2 (N.D. Tex. Jan. 6, 2012) (quoting Siverston v. Clinton, 2011 WL 4100958, at *2 (N.D. Tex. Sept. 14, 2011)).  In Smallwood, for example, the court dismissed the plaintiffs' claims because the facts alleged in the complaint indicated that the action was barred by the statute of limitations.  Id.  By contrast, in Clark, the Fifth Circuit reversed the district court's dismissal of an action to establish mineral rights because the affirmative defense of presumed lost deed "[could not] be established solely on the basis of appellants' pleadings."  794 F.2d at 971.

Defendants are not entitled to dismissal of Enercorp's slander-of-title claim based on the affirmative defense of release, because the release does not clearly and incontrovertibly cover Enercorp's claim.  The release states that the parties agreed to:

> release, relinquish, grant, transfer, assign and convey, each to the other, all liens, deeds, of trust, mortgages, assignments or production, security agreements, financing statements, claims, causes of action, notices of lis pendens, judgments, abstracts of judgment and any and all other encumbrances which one Party may claim against another with regard to title to the Leases.

(Collaboration Agreement ¶ 6 (emphasis added).)  Defendants insist that "[t]his language is clearly meant to bring 'slander of title' within the scope of the release,"

since a plaintiff "must prove that it 'possessed an estate or interest in the property

disparaged'" in order to prevail on a claim for slander of title.  (Mot. at 8–9.)

However, it is not clear that Defendants' interpretation of the release is correct.

Enercorp, in its Response, argues that the release "prevents a party to the

Collaboration Agreement from clouding another party's title to the Montana

Leases subject to the Collaboration Agreement."  (Resp. ¶ 9 (emphasis added).)

"This was not a release of claims against a party for its torts," argues Enercorp,

"but rather was a release of claims and other encumbrances to the leases, in order

to convey clean title to Enercorp."  (Id.)  At the hearing, Enercorp's counsel

insisted that title to the Montana leases is not in dispute, because title to those

leases has already been vested in SEPCO.  (See also Resp. ¶ 19 ("Enercorp has not

pled any cause of action of trespass to try title and does not seek recovery of real

property, which would have been released by Paragraph 6.").)  Rather than title to

the leases, Enercorp seeks monetary damages for its personal claims against

Defendants, which it argues were specifically reserved by Paragraph 7 of the

Collaboration Agreement.  (Resp. ¶¶ 18–19.)

Paragraph 7 of the Collaboration Agreement states:

Personal Claims Retained:  Notwithstanding the foregoing, each of the
Parties retains and does not release, any claims or causes of action for
damages, losses or monetary deficiencies that any Party may have against
another Party, but with all such claims being of a personal nature against a
Party, and not as a claim or encumbrance against the Leases or the lands
included in the projects.

(Collaboration Agreement ¶ 7.)  The language of Paragraph 7 supports Enercorp's argument that its slander-of-title claim is not covered by the Release.  First, Paragraphs 6 and 7 set up a clear distinction between "encumbrances which one Party may claim against another with regard to title to the Leases" (id. ¶ 6 (emphasis added)) and any claims that are "of a personal nature against a Party, and not as a claim or encumbrance against the Leases or the lands included in the projects" (id. ¶ 7 (emphases added)).  In other words, the release distinguishes between (1) actions affecting title (released) and (2) personal actions against a Party for damages (retained).

Slander of title is an action at law for which damages are recoverable; it should not be confused with an equitable action to quiet title.  See CA Partners v. Spears, 274 S.W.3d 51, 83 (Tex. App. 2008) (recognizing distinction between suit to remove cloud on title, which is "an equitable action for which damages are not available," and a suit for slander of title, which is "a tort action for which damages are recoverable") (citing Pampell Interests, Inc. v. Wolle, 797 S.W.2d 392, 395 (Tex. App. 1990)); 67 Tex. Jur. 3d Slander of Title § 1 ("A slander-of-title action is to recover damages for failure to release a purported, though not actual, property interest.  A quiet-title action is a specific, equitable remedy to remove a cloud from a title, and damages are not recoverable.").  Under the distinction created by Paragraphs 6 and 7, therefore, the release would not bar Enercorp's slander-of-title

claim, which seeks damages rather than to remove an encumbrance against the leases.  While Defendants are at liberty to argue as part of a Motion for Summary Judgment that the Court's interpretation of the release is incorrect in light of other considerations, the fact remains that "a successful affirmative defense"—release—does <u>not</u> "appear[] clearly on the face of the pleadings."  <u>Clark</u>, 794 F.2d at 970.  Accordingly, the Court will not dismiss Enercorp's slander-of-title claim on this basis.

      B.    <u>Loss of a "Specific Sale"</u>

        Defendants' second argument is that this cause of action must be dismissed because Enercorp "failed to adequately plead slander of title."  (Mot. at 10.)  Noting that a plaintiff "must prove the loss of a specific sale, i.e., that a pending sale was defeated by the slander" (<u>id.</u> (quoting <u>Williams</u>, 755 S.W.2d at 844)), Defendants insist that Enercorp has not done so.  The reason Enercorp has not pleaded this element, argue Defendants, is that "the sale at issue"—the sale of the Montana Leases to SEPCO—"did go through[,] and US Enercorp has greatly benefited from said sale."  (<u>Id.</u>)

        Enercorp responds (1) that "loss of a specific sale is not a required element of a claim for slander of title[;] all that is required is special damages"; and, in the alternative, (2) that it <u>did</u> plead loss of a specific sale, which is "the sale

of the Montana Leases to SEPCO that it would have made without Defendants'
slanderous actions."  (Resp. ¶ 34.)

   Enercorp's first argument—that "loss of a specific sale is not a
required element"—is flatly contradicted by every Texas state-court case the Court
has found.  <u>See, e.g.</u>, <u>Ellis</u>, 656 S.W.2d at 905 ("We hold that [plaintiffs] were
required to prove the loss of a specific sale or sales in order to recover on their
slander of title action."); <u>A.H. Belo Corp.</u>, 632 S.W.2d at 146 ("We hold that
[plaintiff] was required to prove the loss of a specific sale or sales in order to
recover on his slander of title action."); <u>Marrs and Smith Partnership v. D.K. Boyd
Oil and Gas Co., Inc.</u>, 223 S.W.3d 1, 21 (Tex. App. 2005) ("Because there is no
evidence in the record proving the loss of a specific sale, the evidence is legally
insufficient to support an award of damages for slander of title."); <u>Taub v. Houston
Pipeline Co.</u>, 75 S.W.3d 606, 616 (Tex. App. 2002); <u>Pampell Interests, Inc.</u>, 797
S.W.2d at 395; <u>Coppock & Teltschik v. Mayor, Day & Caldwell</u>, 857 S.W.2d 631,
639 (Tex. App. 1993).  Indeed, under Texas law, a claim for slander of title <u>does
not even accrue</u> "until there has been a loss of a specific sale."  <u>Hill v. Heritage
Resources, Inc.</u>, 964 S.W.2d 89, 116 (Tex. App. 1997) (citing <u>Ellis</u>, 656 S.W.2d at
904–05).

   In the face of this sea of contrary precedent, Enercorp points to the
concurrence in <u>Ellis v. Waldrop</u>, 656 S.W.2d 902 (1983), in which two justices

argued that the holding of <u>A.H. Belo Corporation v. Sanders</u> was merely that "proof showing only impairment of vendibility does not establish a right to damages."  <u>Id.</u> at 906. "In future cases," the concurrence stated, "this Court should allow recovery when the plaintiff can prove with reasonable certainty his pecuniary losses proximately caused by the lender's refusal to provide the loan at the time the plaintiff was seeking it."  <u>Id.</u>  In other words, Enercorp reads <u>A.H. Belo</u> as holding that a plaintiff can satisfy the "special damages" element in many ways, <u>one</u> of which is by alleging the loss of a specific sale.  (Resp. ¶ 34.)

However, even assuming that the <u>Ellis</u> concurrence (rather than the <u>Ellis</u> majority) properly interpreted the Texas Supreme Court's holding in <u>A.H. Belo</u>,[2] the fact remains that every other Texas court to interpret and apply the rule promulgated in <u>A.H. Belo</u>—at least all those the Court has found, and Enercorp points to no counter-examples—has held that a plaintiff pleading slander of title <u>is</u> required to allege loss of a specific sale.  Thus, while many other jurisdictions do not have the same rule,[3] there is simply no question that, under Texas law, "the

---

[2]  This is by no means clear.  The court stated in <u>A.H. Belo</u> that "[t]he <u>only</u> issue before [it was] whether [the plaintiff] was required to prove a specific lost sale or sales in order to recover on his slander of title action."  632 S.W.2d at 145 (emphasis added).  The court then stated: "We hold that Sanders was required to prove the loss of a specific sale or sales in order to recover on his slander of title action."  <u>Id.</u> at 146.

[3]  In some jurisdictions, a plaintiff need only allege a specific pecuniary loss that he suffered as a direct and immediate result of the defendant's disparagement.  <u>See, e.g.</u>, <u>Solley v. Navy Fed. Credit Union, Inc.</u>, 723 S.E.2d 597 (S.C. Ct. App. 2012)

pleading and proof of loss of a specific sale are <u>essential elements</u> to a slander of title cause of action." <u>Tex. Am. Corp. v. Woodbridge Joint Venture</u>, 809 S.W.2d 299, 304 (Tex. App. 1991) (emphasis added); <u>accord</u> <u>Jeanes v. Henderson</u>, 703 F.2d 855, 860 (5th Cir. 1983) (applying Texas law to affirm the district court's directed verdict for the defendant where plaintiff "presented no proof of a pending sale of his interest" that was "defeated by the slander"); 67 Tex. Jur. 3d Slander of Title § 6 ("In a slander-of-title cause of action, the pleading and proof of loss of a specific sale is an essential element."). A federal court cannot rewrite state law, and the Court will not do so here.

The relevant question, therefore, is whether Enercorp has pleaded loss of a specific sale. In the FAC, Enercorp alleges that:

> Defendants uttered and published false and disparaging statements about Enercorp's title [to the oil and gas leases in Montana], . . . causing damage to Enercorp. At a minimum, these damages include the sums Enercorp would have received in the sale of those leases to Purchaser and the development of those leases, but for Defendants' slanderous actions.

---

(holding that special damages include impairment of vendibility or value caused by disparagement and the expense of measures reasonably necessary to counteract the publication, including litigation); <u>Skyland Metro. Dist. v. Mountain W. Enter., LLC</u>, 184 P.3d 106 (Colo. Ct. App. 2007) ("At a minimum, the property must be on the market for sale, and the tort must create a cloud upon the title; then the expense of legal proceedings to remove the cloud on title satisfies the damages requirement."). This is consistent with the Restatement. <u>See</u> Rest. 2d Torts § 623A.

FAC ¶ 30.  Read alone, these sentences could be interpreted to mean that

Defendants' disparaging statements prevented Enercorp from selling some or all of

the Montana Leases to SEPCO.  However, in the context of the rest of the FAC,

and in light of Enercorp's Response to Defendants' Motion, it is clear that this is

not the case.  Instead, Enercorp is alleging that, while it did consummate a contract

to sell all of the Montana Leases to SEPCO, the contract provided for a <u>lower sale</u>

<u>price</u> than Enercorp would have obtained in the absence of Defendants' alleged

slander.  (<u>See</u> FAC ¶ 17 ("As a result of Defendants' unlawful slander of

Enercorp's title . . . Enercorp realized substantially less in its deals with [SEPCO]

. . . ."); Resp. ¶ 34 ("As a result of [Defendants' slander], Enercorp lost the sale of

the Montana Leases to SEPCO that it would have made without Defendants'

slanderous actions, and <u>had to settle on a deal that [was] financially less</u>

<u>advantageous</u> to Enercorp.").)

        Defendants argue that, because Enercorp did consummate a sale to

SEPCO, it cannot possibly prove that it lost a "specific sale."  (Mot. at 10.)

However, the Court is not convinced that the consummation of <u>a</u> sale to SEPCO

automatically precludes a finding that <u>another</u> sale—a sale that was separate and

distinct from the one that was later consummated—was frustrated.  It seems clear,

for example, that the following allegations <u>would</u> satisfy the specific-sale

requirement: (1) that Defendants had made disparaging statements that clouded

Enercorp's title to the Montana Leases; (2) that this disparagement and the uncertainty surrounding title to the Leases caused SEPCO to reject a contract it was otherwise ready to sign; and (3) that Enercorp later sold the Montana Leases to Company X at a lower price that reflected the cloud on Enercorp's title that Defendants had created.  In other words, even though—in this hypothetical— Enercorp did manage to sell the Montana Leases to Company X, a "specific sale" <u>was</u> frustrated (the sale to SEPCO), and Enercorp suffered special damages (the difference in sale price).  The Court cannot see why the same should not be true where the buyer who refuses to proceed with the sale and the buyer that later agrees to purchase the property at a lower price are one and the same—at least where the plaintiff can demonstrate that the sale the defendant frustrated was truly separate and distinct from the one that was later consummated (as, for example, by demonstrating that the contract nearly executed was abandoned and negotiations began anew).

      This, however, is <u>not</u> what Enercorp has alleged.  The Court has searched the FAC in vain for any indication that SEPCO <u>knew</u> of the false and disparaging statements that Defendants allegedly made prior to SEPCO's purchase of the Montana Leases—or, accordingly, that these disparaging statements caused SEPCO to reject a contract that it was otherwise ready to sign.  Enercorp does not plead, for example, that SEPCO withdrew from contract negotiations, citing

concerns about who held title to the leases.  Instead, the FAC suggests that Enercorp entered into the Collaboration Agreement precisely because it wanted to hide the title dispute from SEPCO so that the deal could go forward.  (See FAC ¶ 13 (stating that "Defendants unlawfully threatened to contact [SEPCO] and interfere with Enercorp's deal" and that Enercorp "[took] the actions necessary to consummate its agreement with [SEPCO] . . . [by] enter[ing] into [the] Collaboration Agreement").)[4]  Because Enercorp has given the Court no reason to conclude that SEPCO walked away from the negotiating table after it discovered that Defendants had clouded Enercorp's title, there is no reason to conclude that Defendants' alleged pre-sale actions directly frustrated any specific sale.

To the extent that Enercorp attempts to base its slander-of-title claim on any damages resulting from Defendants' alleged post-sale statements (see FAC ¶ 31 ("Defendants continue to intentionally and maliciously slander Enercorp's title . . . [by making statements that] have cast and continue to cause doubt about the quality of Enercorp's title in the Montana leases . . . .")), that claim fails for the same reason: Even assuming that Defendants' post-sale statements were false, Enercorp does not allege that these statements frustrated a specific sale;

---

[4]   In light of the stated purpose of the Collaboration Agreement (i.e., to prevent SEPCO from discovering that title to some of the Leases was in dispute), it is difficult to discern why, exactly, Enercorp would have had to settle for a less advantageous deal with SEPCO.  However, the Court will not speculate as to potential reasons; it was Enercorp's duty to include the relevant facts in its Complaint.

it merely makes the vague allegation that these statements "caus[ed] damage to Enercorp."  (Id.)

In the absence of any allegations suggesting that Defendants' disparaging statements frustrated a specific, pending sale, Enercorp fails to state a slander-of-title claim.  However, because Enercorp may be able to state a claim for slander of title if given an opportunity to amend and to clarify the factual basis for this claim, this claim is **DISMISSED WITHOUT PREJUDICE**.

II.  <u>Tortious Interference with a Prospective Contract – Prospective Enercorp/SEPCO Contract</u>

To state a claim for tortious interference with prospective contractual relations, a plaintiff must establish the following elements:

> (1) a reasonable probability that the parties would have entered into a business relationship; (2) an intentional, malicious intervention or an independently tortious or unlawful act performed by the defendant with a conscious desire to prevent the relationship from occurring or with knowledge that the interference was certain or substantially likely to occur as a result of its conduct; (3) a lack of privilege or justification for the defendant's actions; and (4) actual harm or damages suffered by the plaintiff as a result of the defendant's interference, i.e., that the defendant's actions <u>prevented the relationship from occurring</u>.

<u>Tex. Disposal Sys. Landfill, Inc. v. Waste Mgmt. Holdings, Inc.</u>, 219 S.W.3d 563, 590–91 (Tex. App. 2007) (citing <u>Bradford v. Vento</u>, 48 S.W.3d 749, 757 (Tex. 2001)).

Enercorp asserts that, "[b]efore contract formation and at a time when Enercorp had not yet consummated a contract with [SEPCO], but at a time when the formation of a contract was reasonably probable, Defendants with knowledge of the probable contract conducted intentional, independently tortious actions in interfering with that prospective contract."  (FAC ¶ 28.)  Enercorp alleges that Defendants' actions caused it damages equal to "the difference in value between the amounts Enercorp would have realized under the contract . . . that would have been formed without the Defendants' tortious interference and the amounts Enercorp actually realized under the contract that was eventually formed . . . ."  (Id.)

Defendants insist that Enercorp has failed to plead two crucial elements.  (Mot. at 11.)  First, "[t]o prevail on a claim for tortious interference with a prospective business relationship, the plaintiff must establish that the defendant intentionally prevented the formation of a business relationship."  Baty v. ProTech Ins. Agency, 63 S.W.3d 841, 860–61 (Tex. App. 2001) (emphasis added).  In this case, argue Defendants, "[n]o contract was actually prevented," because Enercorp consummated its contract with SEPCO.  (Mot. at 11.)  Second, Defendants insist that Enercorp has failed to plead independently tortious conduct.  (Id. at 12.)  Defendants are correct.

A.   <u>Prevention of a Business Relationship</u>

As explained above, because Enercorp acknowledges that it did

consummate <u>a</u> contract with SEPCO, it must, at a minimum, plead facts that would

indicate that Defendants prevented the formation of <u>another</u> contract—one that was

separate and distinct from the one eventually consummated.  It has not done so.

Instead, the closest Enercorp comes to pleading that there were two distinct

contracts—or even two distinct periods of contract negotiation—is its allegation

that it

> sustained damages measured by the difference in value between the amounts
> Enercorp would have realized under the contract with [SEPCO] that would
> have been formed without the Defendants' tortious interference and the
> amounts Enercorp actually realized under the contract that was eventually
> formed between Enercorp and [SEPCO] with Defendants' tortious
> interference.

(FAC ¶ 28.)[5]  However, even this allegation does not clearly state that any

particular contract was <u>prevented from forming</u>.  Instead, the most that can be

gleaned from this allegation is that "the contract that was eventually formed" was

not as beneficial to Enercorp as were earlier versions of that document—something

that is undoubtedly common in contract negotiations.

---

[5] Perhaps recognizing this pleading deficiency, Enercorp argued in its Response
that it had pleaded that "Enercorp had to form a <u>different contract</u> under different,
less favorable terms to Enercorp because Defendants intentionally prevented the
formation of the <u>original</u> contract."  (Resp. ¶ 28 (emphases added).)  However, the
paragraphs Enercorp cites (FAC ¶¶ 13, 28) do not contain the kind of factual
allegations that would support this characterization of the FAC.

The Court is unaware of—and Enercorp has not cited (see Resp. ¶¶ 28–29)—any Texas case in which a contract was consummated but the plaintiff was nevertheless successful on a claim for tortious interference with a prospective business relationship.  Moreover, a decision of the Fourth Circuit, BCD LLC v. BMW Mfg. Co., LLC, 360 F. App'x 428, 436 (4th Cir. 2010), provides persuasive precedent rejecting Enercorp's argument.  In that case, the Fourth Circuit discussed the elements of a tortious interference claim under South Carolina law:

> To assert a claim of tortious interference with prospective contractual relations, the plaintiff must prove that the defendant: (1) intentionally interfered with the plaintiff's potential contractual relations; (2) for an improper purpose or by improper methods; (3) causing injury to the plaintiff.

Id.  This framework is very similar to the one before the Court.  Then, the Fourth Circuit noted that "[a] claim for prospective interference cannot stand where the plaintiff is able to consummate a contract with another party."  Id. (citing Egrets Pointe Townhouses Prop. Owners Ass'n, Inc. v. Fairfield Cmts., Inc., 870 F. Supp. 110, 116 (D.S.C. 1994)).  This appears to mirror the requirement under Texas law that the business relationship be prevented.  "Under South Carolina law," the court continued,

> it is irrelevant that the plaintiff could have realized a better deal "but for" the actions of the defendant because the term "potential" contractual relations does not mean "full" contractual relations.  At the core, a cause of action for interference with prospective contractual relations will thus lie only where

24

> "the aggrieved party [was] . . . unsuccessful in acquiring an expected
> contract due to a third party's intentional and wrongful actions."

Id. (quoting Egrets Pointe, 870 F. Supp. at 116).  Applying this standard to the case

before it, the Fourth Circuit found that the plaintiff could not assert a viable claim

for interference with prospective contractual relations "because [the plaintiff's]

execution of the 2003 Agreement, which expressly terminated the 2002 Agreement

for all purposes, precluded any claim he otherwise would have had." Id.

"Similarly," the court continued, "[the plaintiff] cannot recover on a theory that the

2003 Agreement was less profitable to him than it would have been without

[defendant's] interference." Id.

The Court finds this case persuasive, particularly in light of

Enercorp's failure to cite any contrary precedent.  Merely claiming that the

contract would have been more advantageous to Enercorp in the absence of

Defendants' interference—pleading, in other words, that a contract did not end up

being as beneficial as the plaintiff had hoped—does not satisfy the requirement

that a business relationship be prevented.  As currently pled, therefore, Enercorp's

claim for tortious interference with a prospective contract fails.

B.     Independently Tortious Conduct

Enercorp's cause of action for tortious interference with a prospective

contract fails for a second reason: It fails to allege the commission of

independently tortious conduct.  "[T]o recover for tortious interference with a

25

prospective business relation a plaintiff must prove that the defendant's conduct

was independently tortious or wrongful." <u>Sturges</u>, 52 S.W.3d at 726.  To meet the

independently tortious requirement, "the plaintiff must prove that the defendant's

conduct would be actionable under a recognized tort." <u>Id.</u>

> Enercorp merely alleges that

> [b]efore contract formation and at a time when Enercorp had not yet
> consummated a contract with [SEPCO], but at a time when the formation of
> a contract was reasonably probable, Defendants with knowledge of the
> probable contract <u>conducted intentional, independently tortious actions</u> in
> interfering with that prospective contract.

(FAC ¶ 28 (emphasis added).)  This is precisely the kind of bare, conclusory

allegation that is insufficient under <u>Twombly</u> and <u>Iqbal</u>.  In its Response, Enercorp

attempts to clarify that the independently tortious conduct it alleged was "that

Defendants intentionally interfered with [a] prospective business relationship <u>by</u>

<u>slandering Enercorp's title</u> in the Montana Leases . . . ."  (Resp. ¶ 29 (emphasis

added).)  For the reasons given above (<u>see</u> <u>supra</u> Part I.B.), Enercorp has failed to

state a claim for slander of title; accordingly, Enercorp cannot rely on its

slander-of-title claim—at least as currently pled—to satisfy the

independently-tortious-conduct element.

> For the reasons given, Enercorp's claim for tortious interference with

a prospective contract fails.  However, because Enercorp may be able to cure the

pleading deficiencies if granted leave to amend, this claim is **DISMISSED**

**WITHOUT PREJUDICE**.

III.   <u>Tortious Interference with an Existing Contract – Enercorp/SDC Montana</u>

   <u>Consulting Contract</u>

   A party seeking to establish tortious interference with a contract must

prove four elements: "(1) that a contract subject to interference exists; (2) that the

alleged act of interference was willful and intentional; (3) that the willful and

intentional act proximately caused damage; and (4) that actual damage or loss

occurred." <u>Lazer Spot, Inc. v. Hiring Partners, Inc.</u>, 387 S.W.3d 40, 52 (Tex. App.

2012).   Although at one time the Supreme Court of Texas stated that a plaintiff

also had to establish that the defendant's act of interference was unjustified, <u>see</u>

<u>Sakowitz, Inc. v. Steck</u>, 669 S.W.2d 105, 107 (Tex. 1984), <u>overruled in part as</u>

<u>stated in</u> <u>Buck v. Century 21 Beezley Real Estate, Inc.</u>, 907 S.W.2d 660, 663–64

(Tex. App. 1995), subsequent authority has made clear that justification for any

interference is an affirmative defense.   <u>See</u> <u>Sterner v. Marathon Oil Co.</u>, 767

S.W.2d 686, 690 (Tex. 1989) (overruling that portion of <u>Sakowitz</u> putting burden

of proof with respect to justification on plaintiff).   Thus, once a plaintiff makes out

a prima facie case of tortious interference, a defendant can avoid liability by

establishing some type of privilege or justification for its actions, such as the

exercise of its own rights or its good-faith assertion of rights it believes it has, even

27

if that belief is mistaken.  See Prudential Ins. Co. of Am. v. Fin. Review Servs., Inc., 29 S.W.3d 74, 77–78 (Tex. 2000); Baty v. Protech Ins. Agency, 63 S.W.3d 841 (Tex. App. 2001).

Enercorp alleges that it had a valid contract with SDC Montana Consulting and that Defendants "intentionally, willfully and maliciously interfered with Enercorp's contractual rights by slandering Enercorp's title and causing SDC Montana Consulting, LLC not to perform its contractual obligations to Enercorp." (FAC ¶ 24.)  Defendants' interference with the contract, asserts Enercorp, was the proximate cause of damages to Enercorp, including "the difference in value Enercorp would have realized under the deal with SDC Montana Consulting, LLC and [SEPCO] without Defendants' interference and the actual amount realized with Defendants' interference."  (Id.)

Defendants insist that this claim must be dismissed because Enercorp has failed to plead independently tortious conduct.  (Mot. at 13.)  Pointing to Allied Capital Corp v. Cravens, 67 S.W.3d 486, 491 (Tex. App. 2002), Defendants argue that a plaintiff must plead factual allegations that would be actionable under a recognized tort to state a claim for tortious interference with an existing contract. (Mot. at 12.)  However, Allied Capital involved claims for tortious interference with prospective business relations, not with an existing contract.  See id. at 490. Contrary to Defendants' assertion, Texas law—perhaps reflecting a desire to afford

28

existing contracts more protection than prospective ones, as well as to distinguish between actionable interference and desirable competition during that period before a contract is formed—appears to require only that the alleged interference with an existing contract be "willful and intentional."  See AKB Hendrick, LP v. Musgrave Enter., Inc., 380 S.W.3d 221, 236 (Tex. App. 2012); see also Tex. Integrated Conveyor Sys., Inc. v. Innovative Conveyor Concepts, Inc., 300 S.W.3d 348, 379 (Tex. App. 2009) (contrasting the requirements for tortious interference with existing and prospective contracts and stating that the former requires a showing of willful and intentional interference while the latter requires an independently tortious act); Faucette v. Chantos, 322 S.W.3d 901, 915–16 (Tex. App. 2010) (holding that plaintiff's claim should have been characterized as one for interference with prospective rather than existing contractual relations and that plaintiff was therefore required to demonstrate that defendants engaged in independently tortious acts).  Thus, in Wal-Mart, the Supreme Court of Texas noted "the importance of decoupling interference with contract from interference with prospective relations, and of grounding liability for the latter in conduct that is independently tortious by nature or otherwise unlawful."  52 S.W.3d at 721 (emphasis added).

Under this standard, Enercorp has stated a claim for tortious interference with an existing contract.  It has alleged (1) that there was a valid

contract between it and SDC Montana  Consulting (FAC ¶ 24); (2) that Defendants willfully and intentionally interfered with that contract by "inducing SDC Montana Consulting, LLC to make fraudulent assignments" of leases that "Defendants knew had already been assigned to Enercorp" pursuant to the Enercorp-SDC Montana Consulting contract (id. ¶ 12); and (3)–(4) that this willful and intentional act of interference proximately caused Enercorp actual damage, because Enercorp was forced to enter into the Collaboration Agreement in order to establish title in Enercorp long enough to consummate the deal with SEPCO, and because the title dispute created by Defendants the value of the contract that was eventually signed.[6] See Lazer Spot, 387 S.W.3d at 52.

While Defendants argue that they were acting to protect their own legitimate financial interests and that the Collaboration Agreement specifically references the credit facility (Mot. at 14), the Court reiterates that justification for any interference is an affirmative defense.  See Sterner, 767 S.W.2d at 690; Hill, 964 S.W.2d at 129.  Because Enercorp has stated a claim for tortious interference with an existing contract, Defendants' Motion is **DENIED** as to this claim.

---

[6] Again, it is not clear why—in light of the stated purpose of the Collaboration Agreement—Enercorp's deal with SEPCO suffered.  However, Enercorp has pleaded actual loss with sufficient particularity to prevent dismissal of this claim.

IV.   <u>Tortious Interference with an Existing Contract – Enercorp/SEPCO Contract</u>

The elements of a claim for tortious interference with a contract are

listed in the preceding section.  Enercorp alleges that Defendants

> intentionally, willfully and maliciously interfered and are still interfering
> with Enercorp's contractual rights under [the contract between Enercorp and
> SEPCO] (1) by sending correspondence to [SEPCO] . . . disputing
> Enercorp's title and demanding that Enercorp not be paid as required by
> [the] contract"; (2) by sending correspondence to [SEPCO] . . . including the
> Bakken Assignment and claiming title where Defendants know they own
> none, and (3) by calling and harassing [SEPCO] . . . and slandering
> Enercorp's title through those calls.

(FAC ¶ 26.)  Defendants' interference with the contract with SEPCO, insists

Enercorp, "has caused Enercorp damages," including, "[a]t a minimum . . . the

difference in value Enercorp would have realized under the contract with [SEPCO]

without Defendants' interference and the actual amount realized under the contract

. . . ."  (<u>Id.</u>)

Defendants' first argument is that this claim fails because Enercorp

has not pleaded any independently tortious conduct.  (Mot. at 15.)  However, for

the reasons given in the preceding section, Enercorp need not plead any

independently tortious conduct: This claim is for interference with an <u>existing</u>

contract, not with prospective business relations; Enercorp need only allege that

Defendants willfully and intentionally interfered with the Enercorp-SEPCO

contract and that this interference caused actual damage. Enercorp has properly

alleged this cause of action, because it has pleaded: (1) that it has a valid contract

with SEPCO (FAC ¶ 26); (2) that Defendants willfully and intentionally interfered with that contract by (a) sending correspondence to SEPCO disputing Enercorp's title and demanding that SEPCO not pay Enercorp as required by the terms of the contract, and (b) sending correspondence to SEPCO and claiming title to the Bakken Assignment (id.); and (3)–(4) that Defendants' actions have caused actual damage, because they led SEPCO to declare a "Title Defect" under the contract and to refuse to purchase certain of the Montana Leases that it was otherwise obligated to purchase (id. ¶ 18).

Next, Defendants argue that their actions cannot support a tortious-interference claim because they were acting to protect their own legitimate financial interests. (Mot. at 15.) It is true that "an interfering party is justified in his or her interference if the interference is done in a bona fide exercise of his or her own rights and if he or she has an equal or superior right in the subject matter to that of the other party." Victoria Bank & Trust Co. v. Brady, 811 S.W.2d 931, 939 (Tex. 1991). Again, however, justification is an affirmative defense that Defendants bear the burden of proving; it is not a proper basis for a motion to dismiss. See Sterner, 767 S.W.2d at 690; Hill, 964 S.W.2d at 129.

Finally, Defendants insist that the letter to SEPCO falls under the litigation privilege. (Mot. at 15.) "Any communication, oral or written, uttered or published in the due course of a judicial proceeding is absolutely privileged and

cannot constitute the basis of a civil action in damages for slander or libel."

Reagan v. Guardian Life Ins. Co., 166 S.W.2d 909, 912 (Tex. 1942) (citations

omitted).  "[T]he privilege can extend to statements made out of court so long as

they bear some relation to the proceeding."  Russell v. Clark, 620 S.W.2d 865, 868

(Tex. Civ. App. 1981).  However, while these communications may well fall under

the litigation privilege, "[p]rivilege . . . is an affirmative defense to be proved and

is in the nature of confession and avoidance."  IBP, Inc. v. Klumpe, 101 S.W.3d

461, 471 (Tex. App. 2001) (citing Denton Pub. Co. v. Boyd, 460 S.W.2d 881, 884

(Tex. 1971)); accord French v. French, 385 S.W.3d 61, 73 (Tex. App. 2012).

"Except where the plaintiff's petition shows on its face that the alleged wrongful

action is protected by a privilege, the defendant has the burden of proving that the

act in question is privileged."  IBP, Inc., 101 S.W.3d at 471 (citing Denton, 460

S.W.2d at 884).  Because the FAC does not show on its face that all of Defendants'

alleged wrongful actions are protected by the litigation privilege, Defendants'

Motion to Dismiss is **DENIED** as to this claim.

V.    Breach of Contract

        Enercorp's final cause of action is one for breach of contract.  To

prevail on a breach-of-contract claim, a party must establish the following

elements: (1) a valid contract existed between the plaintiff and the defendant, (2)

the plaintiff tendered performance or was excused from doing so, (3) the defendant

breached the terms of the contract, and (4) the plaintiff sustained damages as a result of the defendant's breach.  <u>West v. Triple B Servs., LLP</u>, 264 S.W.3d 440, 446 (Tex. App. 2008).

Defendants insist that Enercorp has failed to properly plead breach of contract because it "does not quote from the contract, it does not include the contract as an attachment, and it does not summarize the contract's purported legal effect in any way."  (Mot. at 17.)  "Rather, Plaintiff simply makes vague, conclusory references to Defendants' allegedly breaching the contract by sending a letter and apparently making a few phone calls."  (<u>Id.</u>)  Defendants assert that Enercorp failed to plead this cause of action with any detail because "[n]one of the conduct alleged actually breaches the contract."  (<u>Id.</u>)  The Collaboration Agreement does not prohibit Defendants from communicating with SEPCO, insist Defendants, and "there is no requirement to deliver unconditional assignments to anyone, only conditional ones."  (<u>Id.</u> (citing Collaboration Agreement ¶ 12).)

The Court disagrees; Enercorp has satisfied the liberal federal pleading standards.  First, Enercorp has alleged that a valid contract—the Collaboration Agreement—existed between it and Defendants.  (FAC ¶¶ 13–14, 20.)  Enercorp alleges that, pursuant to the Collaboration Agreement, Defendants assigned their interests in the Montana leases to Enercorp so that Enercorp could negotiate its contract with SEPCO.  (<u>Id.</u> ¶ 20.)  Enercorp further alleges that the

34

Collaboration Agreement forbade Defendants from communicating with SEPCO

and obligated Defendants to return the Bakken Assignment to Enercorp.  (Id.

¶¶ 16, 20.)

        Enercorp has satisfied the second element of a breach-of-contract

claim by alleging that it "has performed its obligations and continues to perform its

obligations under the Collaboration Agreement" and that Paragraph 10 excused it

from paying Defendants if Defendants were not "in full compliance with this

[Collaboration] Agreement."  (Id. ¶ 14, 22.)

        Third, Enercorp has alleged that Defendants breached the terms of the

Collaboration Agreement.  Defendants allegedly breached that portion of the

Agreement preventing them from contacting SEPCO when they (1) sent the

December 21, 2012 Letter to SEPCO's office alleging a defect in Enercorp's title

and requesting that SEPCO not pay the funds otherwise owed to Enercorp under

their contract and (2) repeatedly called SEPCO and questioned Enercorp's title.

(Id. ¶ 20.)  In addition, Defendants allegedly breached Paragraph 12 of the

Agreement when they refused to return the Bakken Assignment to Enercorp and

instead sent it directly to SEPCO.  (Id.)  Finally, although Enercorp does not

mention it under the "Breach of Contract" heading, elsewhere in the FAC Enercorp

alleges that Defendants also breached Paragraph 15(d) of the Collaboration

Agreement when they assigned a right under the Agreement to a third party without obtaining the prior written consent of the other parties.  (Id. ¶ 14.)

Enercorp satisfies the fourth and final element of a breach-of-contract claim by alleging that, as a direct result of Defendants' actions, SEPCO has claimed a "Title Defect" and has refused to purchase acreage it was otherwise contractually obligated to purchase.  (Id. ¶ 21.)  Enercorp insists that SEPCO has even named the "Title Defect" the "Taillieu Defect" after Defendants' counsel, Olivier Taillieu.  (Id.)  In addition to the damages resulting from SEPCO's refusal to pay for certain of the Montana leases, Enercorp has expended money to send counsel to Houston in an attempt to resolve the "Taillieu Defect" in a meeting with SEPCO and to attempt to resolve the claimed Title Defect by presenting the issue to a third-party arbitrator.  (Id.)  Enercorp estimates that "[t]he value lost under Enercorp's contract with Purchaser as a result of Defendants' breaches of the Collaboration Agreement exceeds $8,000,000.00."  (Id. ¶ 18.)

While Defendants insist that the Court may dismiss Enercorp's breach-of-contract claims based on the clear language of the Collaboration Agreement (Reply ¶ 9), the language of that Agreement does not clearly and unambiguously defeat Enercorp's claims.  For example, Paragraphs 3 and 8 could be read to prohibit Defendants from communicating with SEPCO: "[SEPCO] has communicated its willingness to contract with only one Party in connection with

36

the Project, that being [Enercorp]"; "Each of the Parties authorize[s] [Enercorp] to conduct all further and necessary negotiations with [SEPCO]."  (Collaboration Agreement ¶¶ 3, 8 (emphasis added).)  Neither can the Court definitively determine whether the Bakken Assignment was conditional or unconditional.   At this early point in the litigation—and especially in light of the complex and disputed facts underlying these claims—the Court simply cannot say with certainty that Enercorp's breach-of-contract claims are defeated by the plain language of the Collaboration Agreement.  Accordingly, Defendants' Motion to Dismiss is **DENIED** as to this claim.

<u>CONCLUSION</u>

For the reasons given, the Court **GRANTS IN PART AND DENIES IN PART** Defendants' Motion to Dismiss (doc. # 16) and **GRANTS PLAINTIFF LEAVE TO AMEND** its complaint within thirty (30) days of the entry of this Order.  Failure to submit an amended complaint within that time will result in the dismissal with prejudice of those claims dismissed without prejudice by this Order.

**IT IS SO ORDERED.**

**DATED:** San Antonio, Texas, August 14, 2013.

_____
David Alan Ezra
Senior United States District Judge

37