UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| U.S. ENERCORP, LTD., | § | No. SA:12-CV-1231-DAE |
|     Plaintiff, | § | |
| v. | § | |
| SDC MONTANA BAKKEN | § | |
| EXPLORATION, LLC; VAL VERDE | § | |
| INVESTMENTS, LLC; and RINGO | § | |
| SHAPIRO, | § | |
|     Defendants. | § | |
| | § | |
| SDC MONTANA BAKKEN | § | |
| EXPLORATION, LLC; VAL VERDE | § | |
| INVESTMENTS, LLC; and RINGO | § | |
| SHAPIRO, | § | |
|     Counter-Plaintiffs, | § | |
| v. | § | |
| U.S. ENERCORP, LTD., | § | |
|     Counter-Defendant. | § | |
| | § | |
| SDC MONTANA BAKKEN | § | |
| EXPLORATION, LLC; VAL VERDE | § | |
| INVESTMENTS, LLC; and RINGO | § | |
| SHAPIRO, | § | |
|     Third-Party Plaintiffs, | § | |
| v. | § | |
| BRUCE GATES, | § | |
|     Third-Party Defendant. | § | |

ORDER (1) DENYING AS MOOT DEFENDANTS' MOTION FOR LEAVE TO
FILE AMENDED ANSWER; (2) DENYING DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT; AND (3) GRANTING ENERCORP AND GATES'S
AMENDED MOTION FOR PARTIAL SUMMARY JUDGMENT

1

On March 11, 2015, the Court heard argument on an Amended Motion for Partial Summary Judgment filed by Plaintiff U.S. Enercorp ("Plaintiff" or "Enercorp") and Third-Party Defendant Bruce Gates ("Gates") (Dkt. # 134). At the hearing, the Court also heard argument on Defendants SDC Montana Bakken Exploration, LLC; Val Verde Investments, LLC; and Ringo Shapiro's (collectively, "Defendants") Motion for Leave to File Amended Answer (Dkt. # 92) and Motion for Summary Judgment (Dkt. # 88).

Olivier Taillieu, Esq., appeared on behalf of Defendants; and Corey Wehmeyer, Esq., and Amy Davis, Esq., appeared on behalf of Enercorp and Gates. After careful consideration of the arguments presented at the hearing and in the supporting and opposing memoranda, the Court **DENIES AS MOOT** Defendants' Motion for Leave to File Amended Answer (Dkt. # 92); **DENIES** Defendants' Motion for Summary Judgment (Dkt. # 88); and **GRANTS** Enercorp and Gates's Amended Motion for Partial Summary Judgment (Dkt. # 134).

<u>BACKGROUND</u>

I.    <u>Factual Background</u>

Enercorp is a Texas-based oil and gas exploration and production company. ("Resp.," Dkt. # 105 at 7.) Defendants Val Verde Investments, LLC ("Val Verde") and SDC Montana Bakken Exploration, LLC ("Bakken Exploration") are entities wholly owned and operated by Defendant Ringo Shapiro

2

("Shapiro").  On March 29, 2011, Enercorp entered into a contract with SDC
Montana, LLC ("SDC Montana"), referred to herein as the "Acquisition
Agreement," in order to acquire oil, gas, and mineral leases in Northern Montana.
(Dkt. #105-1 at 10.)  Under that contract, Enercorp agreed to fund the acquisition
of 15,000 acres of oil and gas leases within a specified area.  (Id.)  SDC Montana, a
company owned by Christopher Dedmon ("Dedmon"), was to use the money
provided by Enercorp to acquire leases in the designated area, record a recording
memorandum, and finally execute a recordable assignment of the leases to
Enercorp.  (Id. at 10–11.)

On September 23, 2011, SDC Montana signed a series of agreements
with Val Verde to address SDC Montana's capital shortfall and resulting inability
to perform under the Acquisition Agreement with Enercorp.  ("Dedmon Dep.,"
Dkt. # 105-12 at 10:2–8; "Shapiro Dep.," Dkt. # 105-11 at 10:23–11:1.)  Under the
agreements, Val Verde loaned $200,000 to SDC Montana in return for a security
interest in the entirety of SDC Montana's property and assets.  (Dkt. # 105-4 at 2;
Dkt. # 105-5 at 2.)  The agreements further provided that Dedmon, in his
individual capacity, personally guaranteed all of the payment and performance
obligations of SDC Montana under the loan and security agreement.  (Dkt. # 105-6
at 2.)  Additionally, SDC Montana engaged Val Verde as a consultant to assist in

negotiating "revised/improved contracts with existing counterparties," as well as new contracts related to the sale of oil and gas leases.  (Dkt. # 105-7 at 2.)

On October 12, 2011, SDC Montana entered into an agreement with Bakken Exploration, referred to herein as the "Lease Facility Agreement."  (Dkt. # 105-2 at 2.)  The Lease Facility Agreement created an arrangement under which SDC Montana was to receive funds from Bakken Exploration, use the funds to acquire oil and gas leases, and assign the leases to Bakken Exploration.  In turn, Bakken Exploration agreed to retransfer the assigned leases to SDC Montana upon repayment of the funds used to acquire the leases.  (Id. at ¶¶ A, 3.5, 4.1.)  While the parties offer competing characterizations of how the Lease Facility Agreement operated in practice, it is uncontested that SDC Montana assigned leases to Bakken Exploration that had been previously obligated or assigned to Enercorp under the Acquisition Agreement.  ("Shapiro Aff.," Dkt. # 89 ¶ 33.)  It is also uncontested that Bakken Exploration recorded leases that had been previously assigned to and recorded by Enercorp.  (Dkt. ## 105-1 at 22, 105-10 at 2; Dedmon Dep. 24:1–28:6.)

In late 2011, Enercorp became aware that Southwestern Energy Production Company ("SEPCO") was interested in acquiring a large quantity of leases in the area, and began negotiating a contract to sell its Montana leases to SEPCO.  ("Gates Aff.," Dkt. # 105-1 at 4.)  As negotiations between Enercorp and

SEPCO progressed, Enercorp and SDC Montana orally agreed to divide the proceeds from the sale of leases to SEPCO on a 50–50 basis.  ("Gates Dep.," Dkt. # 105-13 at 120:13–121:16; Dedmon Dep. at 54:12–55:13.)  This arrangement is referred to herein as the "50–50 Agreement."

In November 2011, Shapiro began communicating with Enercorp and SDC Montana regarding proposed changes to the Acquisition Agreement between Enercorp and SDC Montana.  (Dkt. # 105-1 at 173; Shapiro Dep. 41:12–43:5.)  Defendants maintain that changes were necessary to make the contract "workable" and ensure that SDC Montana could repay its loan to Defendants.  (Shapiro Dep. at 42:5–11.)  These communications were initiated by Shapiro without the consent and despite the objections of SDC Montana.  (Dedmon Dep. 45:4–15.)  On December 18, 2011, having been unable to obtain changes to the Acquisition Agreement, Shapiro left a voicemail with Dedmon stating that Enercorp and SDC Montana would not be able to sell "one [expletive] acre . . . until I get everything I want, and I'm going to be a [expletive] pig about it because I'm tired of this."  (Id. at 57:6–58:4, 167:6–168:4.)

On March 9, 2012, Enercorp entered into an agreement with Bakken Exploration regarding the transfer of certain oil and gas leases between the two parties, referred to herein as the "Letter Agreement."  (Ex. A-3, Dkt. # 105-1 at 25.)  Under the Letter Agreement, Bakken Exploration agreed to assign 37 oil and

gas leases to Enercorp, and Enercorp agreed to immediately assign back 30 of the 37 leases.  (Id.)  Both parties further agreed to negotiate in good faith to enter into an agreement, referred to as "the Collaboration Agreement,"  between themselves, SDC Montana, and JL Resources, LLC, ("JL Resources"),[1] regarding the sale of oil and gas leases to SEPCO.  (Id.)

On March 14, 2012, SDC Montana entered into a contract with Bakken Exploration and Val Verde regarding the previous agreements the parties had entered into in September and October of 2011, referred to herein as the "Omnibus Agreement."  (Dkt. # 89-4.)  Under the Omnibus Agreement, which acknowledged that SDC Montana was in default under the previous agreements, Bakken Exploration and Val Verde conditioned their promise not to pursue the remedies under the previous agreements on SDC Montana assigning its interest in royalties generated by certain oil and gas leases to Bakken Exploration, the execution of the Collaboration Agreement, and the finalization and execution of the SEPCO contract.  (Id. at 2–3.)

According to Dedmon, Shapiro held the leases that SDC Montana had assigned Val Verde under the Lease Facility Agreement "hostage until [Dedmon] signed the Omnibus Agreement," knowing the time-sensitive nature of the pending deal between SEPCO, SDC Montana, and Enercorp.  (Dedmon Dep. 171:18–

---

[1] JL Resources is not party to this litigation.

172:2.)  Shapiro characterizes the Omnibus Agreement as "legally allow[ing] me to approve any deal that Dedmon made with the counterparties to the Collaboration Agreement," and states that the agreement gave him "a proverbial 'seat at the table' in the negotiation of the Collaboration Agreement and ultimately the SEPCO [Contract]."  (Shapiro Aff. ¶¶ 37–38.)  On April 3rd, 2012, Shapiro sent an email to Gates, Enercorp's President and CEO, expressing that SDC Montana was "not in a position" to agree to the 50–50 Agreement that SDC Montana had previously made with Enercorp regarding anticipated revenues from the sale of leases to SEPCO.  (Dkt. # 105-1 at 178.)

On April 13, 2012, Enercorp, SDC Montana, Val Verde, Bakken Exploration, and JL Resources entered into a contract referred to herein as the "Collaboration Agreement."  (Ex. A-4, Dkt. # 105-1 at 1.)  Under that agreement, all leases held by the parties in the relevant area of Montana were transferred, assigned, and quitclaimed to Enercorp.  (Id. ¶¶ 1, 3, 6.)  The Collaboration Agreement authorized Enercorp to conduct negotiations with SEPCO on behalf of the parties to the Agreement, and set out a schedule of payments that each party would receive upon consummation of the SEPCO deal.  (Id. ¶¶ 8, 10.)

According to Enercorp, the purpose of the Collaboration Agreement "was to convey clear title to the Montana Leases to Enercorp, and to stop the Shapiro Entities' interference, so Enercorp could then finalize the contract for the

7

sale of the Montana Leases to SEPCO."  (Gates Aff. 5.)  Gates states that "[t]he only reason the Shapiro Entities were included in the Collaboration Agreement was to obtain clear title to the Montana Leases that the Shapiro Entities had wrongfully and fraudulently acquired from SDC Montana."  (Id.)  Shapiro, for his part, states that the contract addressed uncertainty in the chain of title of leases acquired by SDC Montana, created by "Dedmon's misconduct," and that the agreement allowed the parties to "maximize their returns."  (Shapiro Dep. ¶ 43.)

Enercorp executed the contract with SEPCO to sell the Montana leases, referred to herein as the "SEPCO Contract," on May 1, 2012.  (Ex. A-5, Dkt. # 105-1.)  Pursuant to the Collaboration Agreement, Enercorp distributed to Defendants proceeds from the SEPCO Contract totaling $1,665,691.30 from May through August of 2012.  (Ex. O-1, Dkt. # 105-15 at 5 & Exhibit B.)  Total proceeds from the SEPCO Contract came to over $69.5 million.  (Id. at 4.)

On November 15, 2012, representatives for Sari Taicher ("Taicher"), a friend of Shapiro's father, sent a letter to Gates giving notice that Taicher was engaged in a lawsuit with Defendants in which she claimed that she was a partner of Defendants and was entitled to monies received in connection with "any and all projects and businesses relating to the Bakken enterprise."  (Ex. A-6, Dkt. # 105-1.)  The letter requested that Enercorp place funds to be paid to Defendants into an escrow account pending resolution of Taicher's claims.  (Id.)  In response to the

8

letter, Enercorp suspended payments to Defendants under the Collaboration Agreement.  (Gates Aff. 6.)

On December 10, 2012, counsel for Defendants sent a letter to the CEO, COO, Executive Vice President, and General Counsel of SEPCO.  (Ex. C, Dkt. # 105-3.)  The letter stated that Enercorp was in breach of the Collaboration Agreement for failing to pay Defendants, and claimed that Defendants retained an assignment back of leases in the area covered by the SEPCO Contract from Enercorp in the event that Enercorp failed to pay Defendants.  (Id. at 2.)  The letter further alleged that Enercorp was in breach of the SEPCO Contract by virtue of "creating a cloud on the title of the lands" covered by that contract.  (Id. at 2–3.) The letter finally requested that SECPO withhold payments to Enercorp pending the resolution of Defendants' dispute with Enercorp.  (Id. at 3.)  In response, SEPCO sent a letter to Enercorp on December 13, 2012, notifying it of the title defects created by Defendants' adverse claims.  (Ex. A-7, Dkt. # 105-1 at 1.)

Based on these title defects, SEPCO refused to purchase certain leases from Enercorp that it was required to purchase under the SEPCO Contract, and Enercorp sought to negotiate with SEPCO to resolve the defects while also preparing to arbitrate the dispute.  (Gates Aff. 6.)  The title defects were resolved when Bakken Exploration quitclaimed and assigned the leases in question to Enercorp on April 18, 2013.  (Ex. 11, Dkt. # 89-11; Gates Aff. 6.)

9

II.     Procedural Background

        Enercorp filed suit in the 166th Judicial District Court of Bexar

County, Texas on November 19, 2012.  (Dkt. # 1-2.)  Defendants removed the

action to this Court on December 31, 2012, invoking this Court's diversity

jurisdiction.  (Dkt. # 1.)  Enercorp subsequently filed an Amended Complaint

against Defendants on January 28, 2013, asserting causes of action for breach of

contract, tortious interference with existing contract, tortious interference with

prospective contract, and slander of title.  (Dkt. # 13 at 9–12.)  Defendants moved

to dismiss the Amended Complaint on February 11, 2013.  (Dkt. # 16.)  This Court

granted the motion in part, dismissing without prejudice Enercorp's claims for

slander of title and interference with prospective contract and granting Enercorp

leave to amend.  (Dkt. # 37.)

        On September 27, 2013, Defendants filed a third-party complaint

asserting claims against Gates, Dedmon, Jack Gunther, SDC Montana, and SDC

Montana Consulting, LLC, as well as counterclaims against Enercorp.  (Dkt. # 40.)

Specifically, Defendants asserted causes of action for breach of contract,

accounting, and breach of fiduciary duty against Enercorp; for fraud against

Enercorp and Gates; for fraudulent inducement against Enercorp, Gates, SDC

Montana, and Dedmon; and for civil conspiracy to commit fraud against Enercorp,

Gates, and Gunther.  (Id. at 14–23.)  Enercorp, Gates, and Gunther each moved to

dismiss Defendants' claim for civil conspiracy (Dkt. ## 44, 46, 48), and this Court granted the respective motions on April 15, 2014 (Dkt. # 80).  On November 18, 2013, Dedmon, SDC Montana Consulting, LLC, and SDC Montana filed a Motion to Dismiss the claims against them.  (Dkt. #65.)  This Court granted the motion on July 10, 2014.  (Dkt. # 95.)

Defendants filed the instant Motion for Summary Judgment and supporting exhibits on July 1, 2014.  (Dkt. ## 88–90.)  Enercorp filed a Response and supporting exhibits on September 8, 2014 (Dkt. # 105), and Defendants subsequently filed a Reply (Dkt. # 106).

Defendants filed the instant Motion for Leave to File Amended Answer on July 2, 2014 (Dkt. # 92), to which Enercorp did respond.  Enercorp filed a Motion for Leave to File Second Amended Complaint on September 29, 2014.  (Dkt. # 110.)  Defendants filed a Response opposing the Motion on October 6, 2014 (Dkt. # 112), and Enercorp filed a Reply on October 13, 2014 (Dkt. # 113).

Defendants filed an Amended Third-Party Complaint and Counterclaim against Enercorp and Gates on September 5, 2014.  (Dkt. #104.) Enercorp and Third-Party Defendant Bruce Gates filed the instant Amended Motion for Partial Summary Judgment and supporting exhibits on January 28, 2015.  (Dkt. # 134.)  Defendants filed a Response (Dkt. # 131), and Enercorp and Enercorp subsequently filed a Reply (Dkt. #138).

11

At the hearing, the Court granted Enercorp's Motion for Leave to File Second Amended Complaint (Dkt. # 110).  After the Court's ruling, the parties stipulated that the motions for summary judgment should be considered and decided on the basis of Enercorp's Second Amended Complaint.  Remaining before the Court are Defendants' Motion to File Amended Answer, Enercorp's Motion for Partial Summary Judgment, and Defendants' Motion for Summary Judgment.

## LEGAL STANDARD

I.    Motion to Amend

Under Rule 15(a) of the Federal Rules of Civil Procedure, if a pleading is one to which a responsive pleading is required, "a party may amend its pleading once as a matter of course within . . . 21 days after service of a responsive pleading or 21 days after service of a motion under Rule 12(b), (e), or (f), whichever is earlier."  Fed. R. Civ. P. 15(a)(1)(B).  "In all other cases, a party may amend its pleading only with the opposing party's written consent or the court's leave.  The court should freely give leave when justice so requires."  Fed. R. Civ. P. 15(a)(2).

The language of the rule "evinces a bias in favor of granting leave to amend."  Lyn–Lea Travel Corp. v. Am. Airlines, 283 F.3d 282, 286 (5th Cir. 2002).  In considering whether to grant or deny leave to amend, the court "may

consider such factors as undue delay, bad faith or dilatory motive on the part of the movant . . . undue prejudice to the opposing party, and futility of amendment." In re Southmark Corp., 88 F.3d 311, 314–15 (5th Cir. 1996); see also Jones v. Robinson Prop. Grp. L.P., 427 F.3d 987, 994 (5th Cir. 2005).

II.    Summary Judgment

A court must grant summary judgment when the evidence demonstrates "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In seeking summary judgment, the moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). If the moving party meets this burden, the nonmoving party must come forward with specific facts that establish the existence of a genuine issue for trial. Distribuidora Mari Jose, S.A. de C.V. v. Transmaritime, Inc., 738 F.3d 703, 706 (5th Cir. 2013) (quoting Allen v. Rapides Parish Sch. Bd., 204 F.3d 619, 621 (5th Cir. 2000)). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." Hillman v. Loga, 697 F.3d 299, 302 (5th Cir. 2012) (internal quotation marks omitted).

In deciding whether a fact issue has been created, the court must draw all reasonable inferences in favor of the nonmoving party, and it "may not make

credibility determinations or weigh the evidence." Tiblier v. Dlabal, 743 F.3d 1004, 1007 (5th Cir. 2014) (quoting Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000)).  However, "[u]nsubstantiated assertions, improbable inferences, and unsupported speculation are not sufficient to defeat a motion for summary judgment." United States v. Renda Marine, Inc., 667 F.3d 651, 655 (5th Cir. 2012) (quoting Brown v. City of Hous., 337 F.3d 539, 541 (5th Cir. 2003)).

DISCUSSION

I.      Defendants' Motion for Leave to File Amended Answer

        The Court's oral order granting Enercorp's Motion for Leave to File Second Amended Complaint renders moot Defendants' Motion for Leave to File Amended Answer to Enercorp's First Amended Complaint.  The Court therefore **DENIES AS MOOT** Defendants' Motion for Leave to File an Amended Answer.

II.     Defendants' Motion for Summary Judgment

        A.      Tortious Interference Claims

        Enercorp's Second Amended Complaint identifies three contracts as the bases for its tortious interference claims: the Acquisition Agreement between Enercorp and SDC Montana, the subsequent 50–50 Agreement between Enercorp and SDC Montana, and the SEPCO Contract between Enercorp and SEPCO.  (Dkt. # 110 at 11–13.)  In their Motion for Summary Judgment, Defendants contend that Enercorp's claims of tortious interference fail because (1) there were no existing

14

contracts subject to interference; (2) there was no willful and intentional act of interference; (3) any alleged interference was justified; and (4) Enercorp suffered no damages from any alleged interference. (Dkt. # 88 at 13–16, 19.) Because there are genuine disputes of material fact as to each of the elements of tortious interference for each of Enercorp's tortious interference claims, Defendants are not entitled to summary judgment on those claims.

A party seeking to establish tortious interference with a contract must prove four elements: "(1) that a contract subject to interference exists; (2) that the alleged act of interference was willful and intentional; (3) that the willful and intentional act proximately caused damage; and (4) that actual damage or loss occurred." Lazer Spot, Inc. v. Hiring Partners, Inc., 387 S.W.3d 40, 52 n.22 (Tex. App. 2012) (citing Powell Indus., Inc. v. Allen, 985 S.W.2d 455, 456 (Tex. 1998)). Although at one time Texas law required that a plaintiff also establish that the defendant's act of interference was unjustified, see Sakowitz, Inc. v. Steck, 669 S.W.2d 105, 107 (Tex. 1984), overruled in part as stated in Buck v. Century 21 Beezley Real Estate, Inc., 907 S.W.2d 660, 663–64 (Tex. App. 1995), subsequent authority has made clear that justification for any interference is an affirmative defense, see Sterner v. Marathon Oil Co., 767 S.W.2d 686, 690 (Tex. 1989) (overruling the portion of Sakowitz that placed the burden of proof with respect to justification on the Enercorp). Once a plaintiff makes out a prima facie case of

tortious interference, a defendant can avoid liability if its actions were "based on the exercise of either (1) one's own legal rights or (2) its good-faith claim to a colorable legal right, even if that belief is mistaken." Prudential Ins. Co. of Am. v. Fin. Review Servs., Inc., 29 S.W.3d 74, 77–78 (Tex. 2000).

### 1.  Existence of a Contract Subject to Interference

Defendants argue that the Acquisition Agreement and the 50–50 Agreement were not in existence at the time of the alleged interference.[2]  With regard to Enercorp's claim of tortious interference with the Acquisition Agreement between Enercorp and SDC Montana, Defendants argue that the contract was not subject to interference because the Acquisition Agreement had already been breached by SDC Montana when Defendants allegedly interfered with it.  (Dkt. # 106 at 4.)[3]

Under Texas law, a party's obligations to perform under a contract are only discharged upon breach by the other party if the breach is material.  Lennar Corp. v. Markel Am. Ins. Co., 413 S.W.3d 750, 753 (Tex. 2013); Mustang Pipeline Co. v. Driver Pipeline Co., 134 S.W.3d 195, 196 (Tex. 2004) (setting out factors for determining whether a party's breach is material).  The record contains ample

---

[2] Defendants make no argument regarding the existence of the SEPCO Contract.
[3] The Court notes that this argument first appeared in Defendants' Reply.  While arguments raised for the first time in a reply brief are generally waived, Jones v. Cain, 600 F.3d 527, 541 (5th Cir. 2010), the Court will address Defendants' argument because Enercorp had the opportunity to respond during the March 11, 2015 hearing.

evidence to support a dispute of material fact as to the materiality of SDC Montana's breach of the Acquisition Agreement, including the continuing contractual relationship between Enercorp and SDC Montana under the Acquisition Agreement following the latter's breach.  (Gates Dep. 37:10–24; Ex. A-1, Dkt. # 105-1 at 5–11).  Defendants have therefore failed to show that the Acquisition Agreement, as a matter of law, was not an existing contract subject to interference when Defendants entered into its allegedly interfering agreements with SDC Montana.

Defendants also argue that the 50–50 Agreement between SDC Montana and Enercorp was not an existing contract subject to interference because it was merged into the subsequent Collaboration Agreement.  (Dkt. # 88 at 16.)  While the merger of the 50–50 Agreement into the Collaboration Agreement is undisputed, (Dkt. # 105 at 17), Enercorp has provided sufficient evidence to establish a dispute of material fact as to whether Defendants tortiously interfered with the 50–50 Agreement prior to its dissolution under the Collaboration Agreement's merger clause.  Specifically, Enercorp has submitted an email from Shapiro to Gates, dated April 3, 2012, in which Shapiro states that "40-50% or what ever is in the draft is a bit more than what I expected.  Bottom line is Chris [Dedmon] was not in a position to make that deal."  (Ex. A-11, Dkt. #105-1.)  The Collaboration Agreement was not executed until April 13, 2012, (Ex. A-4, Dkt.

# 105-1), and the 50–50 Agreement was thus still in existence at the time of Shapiro's alleged interference.

Defendants further argue that the evidence of the existence of the 50–50 Agreement is inadmissible parol evidence and thus cannot be used as a basis for Enercorp's tortious interference claim.  (Dkt. # 88 at 16–17.)  While a party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence, Fed. R. Civ. P. 56(c)(2), Defendants' argument has no basis here.  Where an integrated agreement contains a merger clause, the parol evidence rule prohibits the introduction of evidence of prior negotiations and agreements related to the transaction to add to, vary, or contradict the terms of the agreement.  See ISG State Operations, Inc. v. Nat'l Heritage Ins. Co., Inc., 234 S.W.3d 711, 719 (Tex. App. 2007).  Evidence of the 50–50 Agreement is not being used to add to, vary, or contradict the terms of a separate, fully integrated agreement.  It is instead being used to establish that the 50–50 Agreement was itself an existing contract that was subject to interference by Defendants.  The parol evidence rule thus has no application here.[4]

---

[4] Defendants' further argument, also raised for the first time in their Reply, that the 50–50 Agreement was void under the Statute of Frauds and thus not subject to interference is without merit.  It is well-established that a contract may be the subject of an interference action even though it is unenforceable between the contracting parties.  Exxon Corp. v. Allsup, 808 S.W.2d 648, 654–55 (Tex. App. 1991) (citing Clements v. Withers, 437 S.W.2d 818, 821 (Tex. 1969)); Consol. Petroleum Indus. v. Jacobs, 648 S.W.2d 363, 367 (Tex. App. 1983) (same).

2.  <u>Willful Act of Interference</u>

A "willful and intentional" act requires "only that the actor desires to cause the consequences of his act, or that he believes that the consequences are substantially certain to result from it.  <u>Amigo Broad., LP v. Spanish Broad. Sys., Inc.</u>, 521 F.3d 472, 490 (5th Cir. 2008) (quoting <u>Sw. Bell Tel. Co. v. John Carlo Tex., Inc.</u>, 843 S.W.2d 470, 472 (Tex. 1992)).  "[T]he interfering party must have actual knowledge of the contract or business relation in question, or knowledge of facts and circumstances that would lead a reasonable person to believe in the existence of the contract or business relationship."  <u>Id.</u>

Defendants argue that there is no evidence that Defendants intentionally interfered with the Acquisition Agreement between Enercorp and SDC Montana.  (Dkt. # 106 at 6–8.)  Defendants assert that their contracts with SDC Montana were intended to assist SDC Montana perform under the Acquisition Agreement with Enercorp, and that there is no evidence that Defendants desired SDC Montana to breach the agreement.  (<u>Id.</u> at 6.)

Defendants' argument fails because there is sufficient evidence in the record to establish a dispute of material fact as to whether Defendants knew or should have known that its contracts with SDC Montana would induce SDC Montana to breach the Acquisition Agreement with Enercorp.  Under the Acquisition Agreement, SDC Montana was to use money provided by Enercorp to

19

acquire oil and gas leases in a designated area, record recording memoranda for the acquired leases, and finally execute recordable assignments of the leases to Enercorp.  (Ex. A-1, Dkt. # 105-1 at 1–2.)  The agreement gave SDC Montana responsibility for curing title to the leases, to the extent necessary.  (Id. at 2.)  The Amendment to the Agreement, dated September 2011, further clarified that "[c]onsistent with the terms of the Acquisition Agreement, each lease acquired by SDC shall be assigned to [Enercorp] by a good and sufficient assignment, free and clear of liens, claims and encumbrances created or permitted by or under SDC . . . ."  (Id. at 6.)

Shapiro does not dispute that he knew of the Acquisition Agreement at the time of the contracts with SDC Montana.  (Shapiro Aff. ¶ 6.)  Val Verde's security agreement with SDC Montana granted Val Verde a security interest in "all of [SDC Montana]'s right, title and interest in and to all of its property and assets . . . including, without limitation . . . whether now owned or hereafter acquired . . . all Leases and Other Contracts."  (Ex. E, Dkt. # 105-5 at 2.)  This provision directly conflicts SDC Montana's obligation to acquire and deliver unencumbered leases under the Assignment Agreement with Enercorp.  Taking the inferences supported by the record in the light most favorable to the nonmoving party, there is a genuine dispute of material fact as to whether Defendants intended

to cause SDC Montana to breach its agreement with Enercorp through the provisions of its security agreement with SDC Montana.

Additionally, the Lease Facility Agreement between Bakken Exploration and SDC Montana created an arrangement under which SDC Montana would receive funds from Bakken Exploration to acquire leases and then assign the leases to Bakken Exploration, which agreed to retransfer the assigned leases to SDC Montana upon repayment of the funds used to acquire the leases.  (Ex. B, Dkt. # 105-2 ¶¶ A, 3.5, 4.1.)  Paragraph 6.1 of the Lease Facility Agreement provides:

> [I]f any Transactions are deemed to be loans, [SDC Montana] hereby pledges, assigns and grants to [Bakken Exploration] a continuing first priority security interest in and lien upon . . . all other property and assets (both tangible and intangible) of [SDC Montana], including . . . whether now owned or hereafter acquired . . . all Leases and other contracts.”

(Id. ¶ 6.1.)  Defendants have repeatedly characterized the transactions as loans, referring to the arrangement as a “loan,” (Dkt. # 106 at 2), a “lending process,” (Shapiro Aff. ¶ 22), and a “sophisticated loan agreement,” (Shapiro Dep. 26:3–19).  This provision of the Lease Facility Agreement is thus also in direct conflict with SDC Montana’s obligations under the Acquisition Agreement with Enercorp.  The evidence, taken in the light most favorable to Enercorp as the nonmovant, therefore establishes a genuine dispute of material fact as to whether Defendants thereby intended to cause SDC Montana to breach the Acquisition Agreement.

21

3.  Damages

Defendants argue that Enercorp has failed to provide evidence that it has suffered damages as a result of any allegedly tortious conduct on the part of Defendants, and that Defendants are therefore entitled to judgment as a matter of law.  (Dkt. # 88 at 19; Dkt. # 106 at 9.)  Enercorp's Second Amended Complaint pleads claims for tortious interference with the Assignment Agreement, the 50–50 Agreement, and the SEPCO Contract.  (Dkt. # 110-1 at 11–13.)  For each claim to survive summary judgment, there must be sufficient evidence to establish a dispute of material fact as to the existence of damages caused by Defendants' tortious interference with the contract at issue.

Defendants have not shown an absence of any genuine dispute of material fact as to the existence of damages to Enercorp.  Gates attests that Defendants' tortious interference with the Acquisition Agreement caused Enercorp to lose the profits it would have made by selling the leases SDC Montana was obligated to convey to Enercorp under the Agreement, but instead conveyed to Defendants.  (Gates Aff. 5.)  Gates further attests that Defendants' interference with the SEPCO Contract cost Enercorp the amount it spent on the attorneys' fees spent to address Defendants' efforts to cloud title to leases included in the Contract.  (Id. at 6–7.)  While the record contains no further documentation of these damages, in the absence of any evidence submitted by Defendants casting

22

doubt on these claims, and taking the evidence in the light most favorable to Enercorp as the nonmovant, Gates's testimony is sufficient to establish a dispute of material fact as to Enercorp's damages under these contracts.

To support a showing of damages from breach of the 50–50 Agreement, Enercorp has submitted a damages analysis performed by a certified public accountant.  (Ex. O-1, Dkt. # 105-15.)  The analysis measures Enercorp's damages by taking the difference between the proceeds from the SEPCO Contract that Enercorp would have received under the 50–50 Agreement with SDC Montana and the proceeds from the Contract that Enercorp ultimately received under the Collaboration Agreement, to which Defendants were parties.  (Id. at 4–8.)  While Defendants argue that the analysis is flawed because it assumes that Defendant Shapiro would not have been involved in the SEPCO Contract absent the alleged interference with the 50–50 Agreement, (Dkt. # 106 at 9), that argument itself goes to a dispute of material fact as to Defendants' conduct with regard to the 50–50 Agreement supported by evidence in the record.

### 4.  Justification Defense

Defendants also argue that to the extent there remain disputed issues of material fact with regard to whether Defendants tortiously interfered with Enercorp's contracts, they are nonetheless entitled to summary judgment based on the justification defense.  (Dkt. # 88 at 13–16.)  The justification defense to tortious

23

interference with contract can be based on the exercise of either (1) a party's own legal rights or (2) a good-faith claim to a colorable legal right, even though that claim ultimately proves to be mistaken.  Prudential Ins. Co. of Am., 29 S.W.3d at 80 (citing Tex. Beef Cattle Co. v. Green, 921 S.W.2d 203, 211 (Tex. 1996)).

"[I]f a trial court finds as a matter of law that the defendant had a legal right to interfere with a contract, the defendant has conclusively established the justification defense, and the motive is irrelevant." Id.  Justification is established as a matter of law when the alleged interference complained of by the plaintiff is "merely the defendant's exercise of its own contractual rights." Id. at 81. However, contractual rights cannot provide justification for interference where the defendant, at the time the contract being relied upon as justification was entered into, knew or should have known that the provisions of such contract would induce the other party to breach its contract with the plaintiff.  See City Bank v. Compass Bank, 717 F. Supp. 2d 599, 621–22 (W.D. Tex. 2010) (denying summary judgment where a dispute of material fact existed regarding whether defendant knew that the terms of its loan refinancing agreement with a third party would induce the third party to breach its loan agreement with plaintiff).

"Alternatively, if the defendant cannot prove justification as a matter of law, it can still establish the defense if the trial court determines that the defendant interfered while exercising a colorable right, and the jury finds that,

24

although mistaken, the defendant exercised that colorable right in good faith."
Prudential Ins. Co. of Am., 29 S.W.3d at 80.  "A jury question is presented only
when the court decides that although no legal right to interfere exists, the defendant
has nevertheless produced evidence of a good faith, albeit mistaken, belief in a
colorable right."  Green, 921 S.W.2d at 211.

  The Court will consider Defendants' justification arguments presented
by Defendants in their memoranda, which assert that any interference was justified
as to (1) the Acquisition Agreement between Enercorp and SDC Montana, and
(2) the SEPCO Contract between Enercorp and SEPCO.

### a. Acquisition Agreement

  Defendants argue that the security agreement and the Lease Facility
Agreement with SDC Montana gave them the right to hold as collateral leases
purchased by SDC Montana.  (Dkt. # 88 at 13–15.)  Defendants argue that these
agreements further gave them the right to dispose of the leases in the event of SDC
Montana's default.  (Id. at 14–15.)  As a result, Defendants argue, their alleged acts
of interference with the Acquisition Agreement between Enercorp and SDC
Montana were in fact merely the exercise of Defendants' contractual rights under
their own agreements with SDC Montana.  (Id. at 15–16.)

  Defendants' argument fails because there is sufficient evidence in the
record to establish a dispute of material fact as to whether Defendants knew or

should have known that the provisions of the contracts upon which Defendants

base their justification claim would induce SDC Montana to breach the Acquisition

Agreement with Enercorp.   As discussed above, Shapiro had actual knowledge of

the Acquisition Agreement, and the provisions of Defendants' security agreement

and Lease Facility Agreement with SDC Montana directly conflict with SDC

Montana's obligations to deliver leases to Enercorp under the Acquisition

Agreement.  See supra, at 21–23.  The evidence that Defendants intended to cause

SDC Montana to breach the Acquisition Agreement through the provisions of its

security agreement and Lease Facility Agreement with SDC Montana render

Defendants unable to rely upon these contracts to support its justification defense,

and Defendants are thus not entitled to summary judgment on this ground.

### b.  SEPCO Contract

With regard to Enercorp's contract with SEPCO, Defendants argue

that while they did contact SEPCO requesting that SEPCO suspend performance of

its contract with Enercorp, they did so to protect their own legitimate financial

interests under the Collaboration Agreement, and that any interference with the

SEPCO Contract was thus justified as a matter of law.  (Dkt. # 88 at 18.)  Enercorp

responds that Defendants had no legal right to contact SEPCO and that Defendants

knew the issue they raised with respect to the SEPCO Contract was meritless.

(Dkt. # 105 at 17–18.)

Defendants' communication with SEPCO does not appear to have been "merely the exercise of their contractual rights" under the Collaboration Agreement.  That agreement provided that Enercorp was to be the sole party to contract with SEPCO and authorized Enercorp to conduct all further and necessary negotiations in order to finalize the SEPCO Contract.  (Ex. A-4, Dkt. # 105-1 ¶¶ 3, 8.)  No right of Defendants to communicate with SEPCO appears in the Collaboration Agreement.

Defendants cite to an older line of cases to support the proposition that an interfering party has a privilege to "protect its own legitimate financial interests."  (Dkt. # 88 at 18.)  In Central Savings & Loan Ass'n v. Stemmons Northwest Bank, N.A., 848 S.W.2d 232 (Tex. App. 1992), a Texas Court of Appeals held that a defendant, as a stockholder of a company, could not be held liable for tortious interference with a contract between the company and the plaintiff.  Id. at 241–42.  The court reasoned that a financial interest "superior" to that of one of the parties to the contract is a legitimate interest that a third party may act to protect without being subject to liability for interference, and that stock ownership is such a superior financial interest.  Id. at 241.  In Hill v. Heritage Resources, Inc., 964 S.W.2d 89 (Tex. App. 1997), a Texas Court of Appeals used Central Savings & Loan to support the proposition that an interfering party has a privilege to protect its own "legitimate financial interest," and that preventing "the

invalid selling of non-existing interests pursuant to a joint operating agreement"
between the plaintiff and defendants was such an interest.  Id. at 115.

Regardless of whether these decisions remain good statements of law
after the Texas Supreme Court's clearer articulations of the justification defense in
Texas Beef Cattle Co. v. Green, 921 S.W.2d 203, 211 (Tex. 1996), and Prudential
Insurance Co. of America v. Financial Review Services, Inc., 29 S.W.3d 74, 80–81
(Tex. 2000), they do not support Defendants' argument under the facts of this case.
Defendants did not own stock in the company with whose contract they allegedly
interfered, and there is no claim that Enercorp was engaging in any type of fraud
under the Collaboration Agreement that would have jeopardized Defendants'
financial interests.  Defendants were simply a party to an agreement with Enercorp
that obligated Enercorp to distribute cash sums and royalty interest received under
Enercorp's separate contract with SEPCO.  (Ex. A-4, Dkt. # 105-1 ¶ 10.)
Defendants have therefore failed to establish that their alleged interference was
based on the exercise of their own legal rights, and thus cannot establish prove
justification for their alleged interference with the SEPCO Contract as a matter of
law.

5.  Privilege for Communication in Course of Judicial Proceeding

Defendants finally argue that the letter sent to SEPCO by Defendants'
counsel on December 10, 2012, which forms part of the basis for Enercorp's claim

28

of tortious interference with the SEPCO Contract, is not actionable because it falls under the litigation privilege.  (Dkt. # 88 at 19.)  Under Texas law, the litigation privilege only protects statements made in the course of a judicial proceeding from forming the basis of civil liability for slander or libel.  See Jenevein v. Friedman, 114 S.W.3d 743, 745 (Tex. App. 2003).  "Any communication, oral or written, uttered or published in the due course of a judicial proceeding is absolutely privileged and cannot constitute the basis of a civil action in damages for slander or libel."  Id. (quoting Reagan v. Guardian Life Ins. Co., 166 S.W.2d 909, 912 (Tex. 1942)).  Because Enercorp's claims are for breach of contract and tortious interference with contract, the litigation privilege has no application here.

B.   Breach of Contract Claims

Defendants further argue that they are entitled to summary judgment on Enercorp's claim for breach of contract because Enercorp has not shown that Defendants breached the Collaboration Agreement.  (Dkt. # 88 at 20–21.) Defendants have also moved affirmatively for summary judgment on their counterclaim for breach of contract.  Defendants argue that Enercorp has breached the Collaboration Agreement by failing to distribute payments to Defendants as required by the terms of the agreement.  (Id. at 12–13, 19–20.)

Under Texas law, the elements of a claim for breach of contract are (1) a valid contract; (2) performed or tendered performance by the plaintiff;

(3) breach of the contract by the defendant; and (4) damage to the plaintiff as a result of the breach.  Smith Int'l, Inc. v. Egle Group, LLC, 490 F.3d 380, 386 (5th Cir. 2007) (quoting Valero Mktg. & Supply Co. v. Kalama Int'l, L.L.C., 51 S.W.3d 345, 351 (Tex. App. 2001)).  To prove that it performed or tendered performance of its own contractual obligations, a plaintiff must demonstrate that it complied with the contract's provisions.  M7 Capital LLC v. Miller, 312 S.W.3d 214 (Tex. App. 2010) (citing Preston State Bank v. Jordan, 692 S.W.2d 740, 744 (Tex. App. 1985)).

"In construing a written contract, the primary concern of the court is to ascertain the true intentions of the parties as expressed in the instrument." Valence Operating Co. v. Dorsett, 164 S.W.3d 656, 662 (Tex. 2005).  "[C]ourts should consider the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless.  Contract terms are given their plain, ordinary, and generally accepted meanings unless the contract itself shows them to be used in a technical or different sense."  Id. (citation omitted).

### 1.    Enercorp's Breach of Contract Claim

Defendants are not entitled to summary judgment on Enercorp's claim for breach of contract because there is a genuine dispute of material fact as to whether Defendants complied with the terms of the Collaboration Agreement.

Enercorp first argues that Defendants breached the Collaboration Agreement when they communicated with SEPCO through their letter of December 10, 2012, and subsequent phone calls.  (Dkt. # 105 at 18–19.)  The language of that agreement, however, does not include a contractual obligation not to communicate with SEPCO.  While the Collaboration Agreement states that its purpose was to consolidate the parties' lease holdings so that SEPCO could contract with a single party, (Ex. A-4, Dkt. # 105-1 ¶¶ 3, 6), and authorizes Enercorp to "conduct all further and necessary negotiations with SEPCO," (id. ¶ 8), nothing in this language suggests an intent to prohibit communication with SEPCO by the other parties to the agreement.

Enercorp next argues that Defendants failed to transfer full record title interest in their leases to Enercorp, as required under the Collaboration Agreement. (Dkt. # 105 at 19–20.)  Paragraph 3 of the Collaboration Agreement states that "the Parties have transferred and are in the process of transferring to [Enercorp] their entire record title interest in the Leases," defined as the leases included in the SEPCO Contract, "and shall continue to do so . . . so that [Enercorp] will be the owner of and entitled to convey the Leases to [SEPCO]."  (Ex. A-4, Dkt. # 105-1 ¶ 3.)  Paragraph 6 provides that each party to the agreement did "release, relinquish, grant, transfer, assign and convey . . . any and all other encumbrances which one Party may claim against another with regard to title to the Leases," and

31

further provided that "the Parties each transfer, assign and quitclaim to [Enercorp] all such liens, claims and encumbrances, as well as all right, title and interest in and to the Leases."  (Id. ¶ 6.)

The record further includes evidence that, having assigned leases to Enercorp on March 9, 2012, Defendants later claimed to SEPCO that they had retained an interest in the assigned leases.  (See Ex. A-3, Dkt. # 105-1; Ex. C, Dkt. # 105-3 at 2; Gates Aff. 7; Ex. A-7, Dkt. # 105-1.)  Taking the evidence in the light most favorable to Enercorp as the nonmoving party, there is a genuine dispute of material fact as to whether Defendants complied with the requirement that they transfer their entire record title in the relevant leases to Enercorp, and thus as to whether Defendants breached their obligations under the Agreement.

Enercorp also argues that Defendants breached the Collaboration Agreement by assigning rights under the agreement to a third party.  Paragraph 15 of the agreement prohibits the parties from assigning their rights under the agreement without the prior written consent of the other parties.  (Ex. A-4, Dkt. # 105-1 ¶ 15(d).)  Such anti-assignment clauses are enforceable in Texas unless rendered ineffective by statute.  Pagosa Oil & Gas, L.L.C. v. Marrs & Smith P'ship, 323 S.W.3d 203, 211 (Tex. App. 2010).

Taicher's November 15, 2012 letter giving Enercorp notice of her lawsuit with Defendants claimed that she was a partner of Defendants entitled to

32

half of "all profits, royalties, fees, or other monies received in connection with any and all projects and businesses relating to the Bakken enterprise." (Ex. A-6, Dkt. # 105-1 at 1.) The record also includes deposition testimony by Taicher that she loaned Defendants $250,000 in October 2011 in exchange for a 50 percent interest in profits from the sale of the leases. (Ex. 1-A, Dkt. # 119-2 at 17:1–17, 19: 25– 20:6, 41:11–24.) Because the evidence indicates that the transaction between Taicher and Defendants predates the Collaboration Agreement, it cannot form the basis of Enercorp's claim for breach of the agreement—Defendants could not have assigned rights under a contract which did not yet exist.[5]  However, because there is a genuine dispute of material fact as to whether Defendants breached the Collaboration Agreement by failing to fully transfer its interest in the relevant leases to Enercorp, Defendants are not entitled to judgment as a matter of law on Enercorp's breach of contract claim.

2.    Defendants' Breach of Contract Claim

Defendants are not entitled to summary judgment on their claim for breach of contract because they have failed to show that there is no genuine dispute

---

[5] Defendants also argued that the issue of whether Taicher was in fact a partner of Defendants under their agreement was decided in a prior suit. This argument is meritless. Collateral estoppel precludes the relitigation of particular issues already resolved in a prior suit only where the party against whom estoppel is asserted was a party to the prior litigation. See Allen v. McCurry, 449 U.S. 411, 414 (1980); Sysco Food Servs., Inc. v. Trapnell, 890 S.W.2d 796, 801–02 (Tex. 1994). Enercorp was not a party to the prior litigation. (Dkt. # 90-1 at 11.)

of material fact as to whether Defendants performed under the Collaboration Agreement and as to whether Enercorp breached the agreement.  As discussed above, Defendants' December 10, 2012 letter to SEPCO claiming a retained interest in the assigned leases creates a genuine dispute of material fact as to whether Defendants complied with the provisions of the Collaboration Agreement requiring them to transfer and quitclaim all right, title, and interest in the relevant leases.  Defendants are therefore unable to show that they "performed or tendered performance" under the agreement.[6]

Additionally, Paragraph 10 explicitly makes distribution of payments by Enercorp contingent on the recipient's "full compliance" with the agreement. (Ex. A-4, Dkt. # 105-1 ¶ 10.)  Subparagraph (g) of Paragraph 10 further provides that in the event Enercorp becomes entitled to payment or claim from or against a party to the Agreement, Enercorp has the right to offset the amount against any obligation to make payment pursuant to the Agreement.  (Id. ¶ 10(g).)  If the offset is subsequently determined to be unwarranted, the Agreement provides for repayment of the amount offset, with interest, by Enercorp to the party against whom the amount was offset.  (Id.)  These provisions of the Collaboration

---

[6] As discussed above, the Court is unpersuaded by Enercorp's interpretation of the Collaboration Agreement to prohibit Defendants from contacting SEPCO.  In light of the record evidence regarding Defendants' incomplete assignment of leases subject to the Agreement, however, that interpretation is not necessary to defeat summary judgment here.

Agreement, in addition to the evidence concerning Defendants' incomplete transfer of lease assignments under the Agreement, create a dispute of material fact as to whether Enercorp had a legal right to withhold payment from Defendants, and thus as to whether Enercorp in fact breached the Agreement.

Because Defendants have not carried their burden of showing the absence of any dispute of material fact regarding Enercorp's claims for tortious interference or breach of contract, or regarding Defendants' own claim for breach of contract, Defendants are not entitled to summary judgment.  The Court therefore **DENIES** Defendants' Motion for Summary Judgment.

III.   Enercorp and Gates' Amended Motion for Partial Summary Judgment

Enercorp and Gates argue that Defendants have failed to present evidence supporting a genuine dispute of material fact as to their claims for fraud, fraudulent inducement, and breach of fiduciary duty, as well as on Defendants' affirmative defenses.  (Dkt. # 134 at 5–6.)  The Court will address each of these claims in turn.

A.   Fraud

Under Texas law, the elements of fraud are:

(1) that a material representation was made; (2) the representation was false; (3) when the representation was made, the speaker knew it was false or made it recklessly without any knowledge of the truth and as a positive assertion; (4) the speaker made the representation with the intent that the other party should act upon it; (5) the party acted in

reliance on the representation; and (6) the party thereby suffered injury.

<u>Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.</u>, 341 S.W.3d 323, 337 (Tex. 2011).  "A promise of future performance constitutes an actionable misrepresentation if the promise was made with no intention of performing at the time it was made."  <u>Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.</u>, 960 S.W.2d 41, 48 (Tex. 1998).  "[T]he mere failure to perform a contract is not evidence of fraud"; instead, fraud requires that the party "made representations with the intent to deceive and with no intention of performing as represented."  <u>Id.</u>

Defendants' Third-Party Complaint and Counterclaim alleges that Enercorp and Gates made a variety of misrepresentations related to the Collaboration Agreement and Enercorp's contract with SEPCO.  (Dkt. # 104 ¶¶ 96–106.)  The only misrepresentation argued in Defendants' brief is Enercorp's promise to pay Defendants under the terms of the Collaboration Agreement, which they allege Enercorp has refused to do.  (<u>See</u> Dkt. # 131 ¶¶ 22–24.)  Enercorp and Gates argue that Defendants have offered no evidence that either Enercorp or Gates made any of the alleged misrepresentations or that Enercorp's promises of future performance with regard to the Collaboration Agreement were made with intent to deceive and with no intent to perform.  (Dkt. # 134 at 8.)

Defendants' evidence consists of an affidavit by Shapiro executed on January 21, 2015 ("Shapiro Supp. Aff.," Dkt. # 131 at 27), and the deposition of

Terry Patty ("Patty"), who, according to Defendants, was "SDC [Montana]'s

landman at the time," (Dkt. # 131 ¶ 23).  There is no evidence in the record,

including the excerpts of Patty's deposition submitted by the parties, of Patty's

relationship to the parties in this case.  Shapiro's affidavit states, in relevant part:

> [Enercorp] made specific representations to me that upon transferring
> the leases to [Enercorp], [Enercorp] would negotiate on my behalf,
> receive all proceeds on my behalf, and account for all proceeds
> according to our agreement.  These representations were all made
> prior to the signing of the Collaboration Agreement and were essential
> in inducing me to assign my interests in the assignments and transfer
> them over to [Enercorp].  Had [Enercorp] not made these
> representations, I would have sold the leases I had interests in to third
> parties at a significant mark up, as the market in that area had surged
> in price. . . .
>
> Time and time again, [Enercorp] promised to perform on the
> Collaboration Agreement if I assigned all of my rights to the oil and
> gas leases to [Enercorp].  This caused me to assign, on March 9, 2012,
> all of my interests in the oil and gas leases to [Enercorp].  Subsequent
> to this, [Enercorp] continued to represent that it would perform on the
> Collaboration Agreement by making repeated promises that
> [Enercorp] would lead the negotiations and obtain a deal from
> [SEPCO], the proceeds of which would be paid in part to me.
> Promises were made prior to and during the negotiations that
> [Enercorp] would perform on the Collaboration Agreement.  As we
> now know, these promises were false.

(Shapiro Supp. Aff. ¶¶ 15–17, 27–30.)  This testimony supports the assertion that

Enercorp made a promise of future performance with respect to its obligations

under the Collaboration Agreement, but does not show that Enercorp's

representations were made with intent to deceive or that Enercorp had no intention

of performing as represented.

Defendants argue that Patty's deposition testimony shows that Enercorp and Gates never intended to pay Defendants under the terms of the Collaboration Agreement.  Patty testified that he overheard conversations between Gates and Dedmon concerning "how they were going to handle" Shapiro, and that "it was clearly stated that they would not be paying him; that they would be paying him with his own money, you know, that they did not intend to pay him."  (Dkt. # 131 at 56.)  Patty also answered affirmatively when asked whether he had "ever heard Mr. Gates tell Mr. Dedmon that Mr. Gates would agree to enter into the Collaboration Agreement with Mr. Shapiro and his companies, but that they never intended on paying him."  (Id. at 54–55.)  In their Reply, Enercorp and Gates submitted excerpts of the deposition in which Patty testified that at the time of the deposition, he was on "eight or nine" medications to treat his terminal cancer, and answered affirmatively to a question asking whether, due to the medications and his illness, it was "hard for you to remember with certainty the exact details and dates of everything that happened over the last few years."  (Dkt. # 138 at 18, 21.)  When asked if only Dedmon, and not Gates, made the statement concerning payment to Defendants, Patty testified "I'm pretty sure [Gates] said it.  But now, I'm not going to—you know, the state I'm in, I'm not going to just swear that he said it."  (Id. at 20.)

38

It is not the Court's role at summary judgment to make credibility determinations or weigh the evidence.  Tiblier v. Dlabal, 743 F.3d 1004, 1007 (5th Cir. 2014).  The Court must, however, take the record "as a whole."  Hillman v. Loga, 697 F.3d 299, 302 (5th Cir. 2012).  The record includes evidence that Enercorp paid a total of $1,665,691.30 to Bakken Exploration and Val Verde pursuant to the Collaboration Agreement from May through August of 2012.  (Ex. O-1, Dkt. # 105-15 at 5, Exhibit C)  Shapiro's first affidavit asserts that Enercorp "owes me and my companies at least an additional $6.7 million under the terms of the Collaboration Agreement," apparently acknowledging that Enercorp partially performed before ceasing its payments to Defendants.  (Shapiro Aff. ¶ 59 (emphasis added).)  Additionally, the record includes undisputed evidence that Enercorp ceased payments to Defendants in response to Taicher's request, sent on November 15, 2012, that any money owed to Defendants be deposited into a third-party escrow account pending resolution of her lawsuit against Defendants.  (Ex. A-6, Dkt. # 105 at 156; Gates Aff. 6.)

This evidence, taken in the light most favorable to Defendants as the nonmovants, shows that any intention to deceive Defendants and not perform at the time Enercorp and Gates promised future payment under the Collaboration Agreement had disappeared before the time to pay Defendants had arrived. Following execution of the SEPCO Contract on May 1, 2012, Enercorp made

payments to Defendants under the Collaboration Agreement in May, June, and August of that year totaling more than $1.6 million.  (<u>See</u> Ex. O-1 at Exhibit C.) The record therefore does not support a dispute of material fact concerning whether the representations made by Gates or Enercorp—specifically, that Enercorp would pay Defendants under the Collaboration Agreement—were false.

Defendants argue that Enercorp's failure to make payments following the resolution of Taicher's claim, and following the resolution of the title defect arising out of Defendants' December 10, 2012 letter to SEPCO, provides circumstantial evidence that Enercorp never intended to pay Defendants under the Collaboration Agreement.  (Dkt. # 131 at 8.)  This argument ignores Paragraph 10 of the Collaboration Agreement, discussed above, which makes distribution of payments by Enercorp contingent on the recipient's "full compliance" with the agreement and provides that in the event Enercorp becomes entitled to payment or claim from or against a party to the agreement, Enercorp has the right to offset the amount against any obligation to make payment.  (Ex. A-4, Dkt. # 105-1 ¶ 10.) Thus under the terms of the agreement, Enercorp was entitled to withhold payment based on its claims against Defendants for tortious interference with contract and breach of contract, which it formalized by filing this suit on November 19, 2012. (Dkt. # 1-2 at 1; Dkt. # 13.)

Defendants have not submitted evidence sufficient to support a genuine dispute of material fact as to whether Enercorp or Gates's representations that Enercorp would pay Defendants under the terms of the Collaboration Agreement were false.  Defendants have cited no evidence in the record to support any of the other misrepresentations alleged in its Third-Party Complaint and Counterclaim, and the Court has found none.  Enercorp and Gates are therefore entitled to judgment as a matter of law on Defendants' fraud claim.

B.   Fraudulent Inducement

Fraudulent inducement is a particular kind of fraud arising in the context of a contract.  To prove fraudulent inducement, a plaintiff must show (1) a misrepresentation; (2) that the defendant knew the representation was false and intended to induce plaintiff to enter into the contract through that misrepresentation; (3) that plaintiff actually relied on the misrepresentation in entering into the contract; and (4) that plaintiff's reliance led plaintiff to suffer an injury through entering into the contract.  Bohnsack v. Varco, L.P., 668 F.3d 262, 277 (5th Cir. 2012) (citing Samson Lone Star, Ltd. P'ship v. Hooks, No. 01-09-328-CV, 2011 WL 3918093, at *11 (Tex. App. 2011)).  The plaintiff's reliance must be a "material factor" in his decision to enter into the contract, and the plaintiff must show that "he would not have entered into the contract in the

absence of the misrepresentation." Id. (citing Williams v. Dardenne, 345 S.W.3d 118, 126 (Tex. App. 2011)).

The above analysis of Defendants' claim for fraud applies equally to their claim for fraudulent inducement.  Enercorp distributed payments to Defendants under the Collaboration Agreement from May through August of 2012, and only ceased performance after receipt of Taicher's notice of her lawsuit against Defendants on November 15, 2012.  (Ex. O-1, Dkt. # 105-15 at Exhibit B; Ex. A-6, Dkt. # 105 at 156; Gates Aff. 6.)  Enercorp filed this suit four days later, on November 19, 2012.  (Dkt. # 1-2.)  The evidence, considered in the light most favorable to Defendants as the nonmovants, does not support a genuine dispute of material fact as to whether Enercorp and Gates's representations that Enercorp would make payments to Defendants under the Collaboration Agreement were false.  Defendants have cited no evidence in the record to support any of the other misrepresentations alleged in its Third-Party Complaint and Counterclaim, and the Court has found none.  Enercorp and Gates are therefore entitled to summary judgment on Defendants' claim for fraudulent inducement.

C.    Breach of Fiduciary Duty

Defendants allege that Enercorp's responsibility for distributing funds under the Collaboration Agreement placed it in the position of a fiduciary in relation to the other parties to the agreement.  (Dkt. # 104 ¶ 131.)  Enercorp argues

42

that its relationship with Defendants was merely contractual, not fiduciary.  (Dkt.

# 134 at 11.)  In its response brief, Defendants argue that (1) the Collaboration

Agreement formed an agency relationship between Enercorp and the other parties

to the agreement, and (2) that a fiduciary relationship existed based on a

relationship of trust predating the Collaboration Agreement.  (Dkt. # 131 at 10, 14.)

      The elements of a claim for breach of fiduciary duty are "(1) a

fiduciary relationship between the plaintiff and defendant; (2) a breach of the

fiduciary duty to the plaintiff; and (3) injury to the plaintiff (or benefit to the

defendant) as a result of the breach."  AmeriPath, Inc. v. Hebert, 447 S.W.3d 319,

340 (Tex. App. 2014).  A fiduciary relationship may be based on certain formal

relationships, such as an agency relationship, that create a fiduciary duty as a

matter of law.  Meyer v. Cathey, 167 S.W.3d 327, 331 (Tex. 2005).

      An agency relationship requires "a meeting of the minds" between the

parties in which the principal intends that the agent act for him and the agent

intends to accept the authority and act on it.  A & S Elec. Contractors, Inc. v.

Fischer, 622 S.W.2d 601, 603 (Tex. App. 1981).  An agency relationship may be

inferred from the parties' conduct and any relevant facts and circumstances

surrounding the transaction.  Chien v. Chen, 759 S.W.2d 484, 497 (Tex. App.

1988).  "To prove an agency relationship between parties, the party asserting the

agency must prove the principal has the right to assign the agent's task and the

right to control the means and details by which the agent will accomplish its

assigned task." Greater Hous. Radiation Oncology, P.A. v. Sadler Clinic Ass'n,

P.A., 384 S.W.3d 875, 899 (Tex. App. 2012).

A fiduciary relationship may alternatively be based on "an informal

fiduciary duty that arises from a moral, social, domestic or purely personal

relationship of trust and confidence." Meyer, 167 S.W.3d at 331 (internal

quotation marks omitted).  "In order to give full force to contracts," courts

applying Texas law "do not create such a relationship lightly." Schlumberger

Tech. Corp. v. Swanson, 959 S.W.2d 171, 177 (Tex. 1997).  "[A] party to a

contract is free to pursue its own interests, even if it results in a breach of that

contract, without incurring tort liability." Crim Truck & Tractor Co. v. Navistar

Int'l Transp. Corp., 823 S.W.2d 591, 594 (Tex. 1992).  "To impose an informal

fiduciary duty in a business transaction, the special relationship of trust and

confidence must exist prior to, and apart from, the agreement made the basis of the

suit." Meyer, 167 S.W.3d at 331 (quoting Associated Indem. Corp. v. CAT

Contracting, Inc., 964 S.W.2d 276, 287 (Tex. 1998)).  "[M]ere subjective trust

does not, as a matter of law, transform arm's-length dealing into a fiduciary

relationship." Swanson, 959 S.W.2d at 177.

Defendants state that "the Collaboration Agreement's terms are

indicative of an agency relationship," and without further explanation, excerpt

extensively from those portions of the Agreement which they believe indicate an agency relationship.  (Dkt. # 131 at 10.)  None of the cited language establishes that the Collaboration Agreement gave Defendants the right to assign Enercorp's tasks and the right to control the means and details by which Enercorp was to accomplish them.  Paragraph 8, relating to Enercorp's authority under the agreement, authorized Enercorp "to conduct all further and necessary negotiations with [SEPCO] in order to finalize and conclude the [SEPCO Contract] substantially in accordance with the Letter of Intent."  (Ex. A-4, Dkt. # 105-1 ¶ 8.) The agreement thus authorized Enercorp to act on behalf of the parties to the agreement in its negotiations with SEPCO, but did not give any party the authority to direct how the negotiations were to be conducted or the details of the final agreement.  Indeed, Enercorp was entitled to execute the SEPCO Contract and bind the leases assigned to Enercorp by the parties without further authorization from any party if, in Enercorp's "commercially reasonable opinion," the SEPCO Contract was "materially and substantially in accordance with the Letter of Intent." (Id.)

The Collaboration Agreement further provides that Enercorp "shall act with due regard and in good faith with respect to the beneficial rights of the Parties hereunder, but shall have no liability to any Party with respect to its actions or omissions except in the event of gross negligence or willful misconduct."  (Id.)

45

This explicit contractual limitation on Enercorp's liability is inconsistent with an intent that Enercorp act as an agent for the other parties to the agreement and any intent on the part of Enercorp to accept such authority.  Defendants also cite Paragraph 10, which states that Enercorp will be responsible for distributing money received from the SEPCO Contract and sets out how payments are to be distributed to the parties.  (Id. ¶ 10.)  This language does not give Defendants the right to assign Enercorp tasks or control the means and details of how Enercorp distributed the funds.  To the extent that Defendants would argue that the duty to distribute payments made Enercorp an escrow agent, that argument would fail—an escrow agent must be appointed through a specific written instrument that imparts a specific legal obligation.  Jones v. Blume, 196 S.W.3d 440, 448 (Tex. App. 2006).

Defendants also assert an informal fiduciary relationship based on a relationship of trust predating the Collaboration Agreement.  Defendants cite the March 9, 2012 assignment of leases from Bakken Exploration to Enercorp (Ex. A-3, Dkt. # 105-1), and Shapiro's supplemental affidavit, which states that "the relationship of trust predates the signing of the Collaboration Agreement," that the March 9 assignment was made in reliance "on the trust and good faith of [Enercorp] to negotiate and finalize a Collaboration Agreement," and that the

"assignment was performed outside of the agreement subject to this litigation,"

(Shapiro Supp. Aff. ¶¶ 33–35).

The March 9 assignment cannot serve as the basis of a relationship of trust between Defendants and Enercorp because it did not exist "apart from" the Collaboration Agreement.  The assignment was made under the terms of a Letter Agreement that includes a promise by Enercorp and Bakken Exploration to "negotiate in order to enter into a definitive agreement ('the Collaboration Agreement')."  (Ex. A-3, Dkt. # 105-1 at 25.)  The Collaboration Agreement also explicitly identifies the Letter Agreement as one of the "Party Contracts" under which the parties acquired the leases subject to the Collaboration Agreement.  (Ex. A-4, Dkt. # 105-1 ¶ 2 & Exhibit B.)  Shapiro's own statement that he "rel[ied] on the trust and good faith of [Enercorp] to negotiate and finalize a Collaboration Agreement" in making the March 9 assignment acknowledges that the assignment contract was executed in furtherance of the Collaboration Agreement, contradicting the subsequent conclusory legal assertion that the assignment "was performed outside of the agreement subject to this litigation."  (Shapiro Supp. Aff. ¶¶ 34–35.)

This evidence, taken in the light most favorable to Defendants as the nonmovants, shows that the Letter Agreement was an arms-length transaction entered into for the parties' mutual benefit, and thus does not establish a basis for a

fiduciary relationship.  See Meyer, 167 S.W.3d at 331.  Shapiro's statement that he relied on the trust and good faith of Enercorp is insufficient to transform their contractual relationship into one of fiduciary duty.  See Swanson, 959 S.W.2d at 177.  Defendants point to no other evidence in the record that would establish an informal fiduciary relationship with Enercorp, and the Court has found none. There is thus no genuine dispute of material fact as to the existence of a fiduciary relationship between Defendants and Enercorp, and Enercorp is entitled to judgment as a matter of law on Defendants' claim for breach of fiduciary duty.

> D.    Affirmative Defenses

Defendants have asserted the affirmative defenses of estoppel, fraud, illegality, laches, statute of limitations, waiver, and release.  (Dkt. # 43 at 12–13.) Enercorp and Gates argue that Defendants have failed to produce evidence supporting a genuine dispute of material fact as to each of these affirmative defenses.  (Dkt. # 134 at 6.)  The Court will address each in turn.

> 1.    Estoppel & Fraud

The law of fraud is discussed above, and applies when a speaker makes a material misrepresentation that that the speaker knows to be false with the intent that the other party act on it, the other party acts in reliance on the misrepresentation, and the other party suffers injury as a result.  Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am., 341 S.W.3d 323, 337 (Tex. 2011).

The doctrine of equitable estoppel generally prevents one party from misleading another to the other's detriment or to the misleading party's own benefit, and requires many of the same elements: "(1) a false representation or concealment of material facts; (2) made with knowledge, actual or constructive, of those facts; (3) with the intention that it should be acted on; (4) to a party without knowledge or means of obtaining knowledge of the facts; (5) who detrimentally relies on the representations." Ulico Cas. Co. v. Allied Pilots Ass'n, 262 S.W.3d 773, 778 (Tex. 2008); Johnson & Higgins of Tex., Inc. v. Kenneco Energy, Inc., 962 S.W.2d 507, 515–16 (Tex. 1998).

      The analysis of Defendants' claim for fraud discussed above applies equally here to Defendants' assertions of fraud and estoppel as affirmative defenses. The evidence, taken in the light most favorable to Defendants, does not support a genuine dispute of material fact as to whether Enercorp or Gates made a false representation to Defendants, and Enercorp is entitled to judgment as a matter of law on Defendants' defenses of fraud and estoppel.

      2.    Illegality

      A contract is illegal and void if the contract obligates the parties to perform an action that is forbidden by the law of the place where the action is to occur. In re OCA, Inc., 552 F.3d 413, 422 (5th Cir. 2008) (citing Miller v. Long-Bell Lumber Co., 222 S.W.2d 244, 246 (Tex. 1949)). "[W]here the illegality does

not appear on the face of the contract it will not be held void unless the facts showing its illegality are before the court." <u>Lewis v. Davis</u>, 199 S.W.2d 146, 149 (Tex. 1947).

Defendants have offered no argument concerning the illegality of any of the contracts forming the basis of Enercorp's claims for tortious interference with contract or breach of contract. No illegality appears on the face of Enercorp's Acquisition Agreement with SDC Montana, its 50–50 Contract with SDC Montana, the Collaboration Agreement, or the SEPCO Contract, and there are no facts before the court showing that any of the contracts obligated any of the parties to perform an illegal act. The Court therefore finds that there is no genuine dispute of material fact as to Defendants' affirmative defense of illegality, and Enercorp is entitled to judgment as a matter of law as to that defense.

### 3.   <u>Statute of Limitations</u>

Under Texas law, a suit for breach of contract must be brought within four years after the contract is breached. Tex. Civ. Prac. & Rem. Code § 16.051; <u>Stine v. Stewart</u>, 80 S.W.3d 586, 592 (Tex. 2002). Claims for tortious interference with contract must be brought within two years from the time the cause of action accrues. Tex. Civ. Prac. & Rem. Code § 16.003(a); <u>Jackson v. W. Telemarketing Corp. Outbound</u>, 245 F.3d 518, 523 (5th Cir. 2001) (citing <u>First Nat'l Bank of Eagle Pass v. Levine</u>, 721 S.W.2d 287, 289 (Tex. 1986)).

Defendants' actions complained of by Enercorp as tortious interference—specifically, inducing SDC Montana to assign leases to Defendants that were contractually obligated to Enercorp, refusing to allow SDC Montana to enter into the 50–50 Contract, and communicating with SEPCO regarding Enercorp's performance under the SEPCO Contract—were taken in 2011 and 2012.  Enercorp filed this suit in the District Court of Bexar County, Texas on November 19, 2012, well within the relevant limitations period.  (Dkt. # 1-2.) Defendants allegedly breached the Collaboration Agreement in December 2012. Enercorp filed an Amended Complaint including its claim for breach of contract on January 28, 2013, also well within the limitations period.  (Dkt. # 13.)  Enercorp is therefore entitled to judgment as a matter of law as to Defendants' statute of limitations defense.

    4. <u>Laches</u>

    To assert the affirmative defense of laches, the defendant must show "unreasonable delay by one having legal or equitable rights in asserting them" and "a good faith change of position by another to his detriment because of the delay." <u>Caldwell v. Barnes</u>, 975 S.W.2d 535, 538 (Tex. 1998).  "Laches should not bar an action on which limitations has not run unless allowing the action would work a grave injustice."  <u>Id.</u>

As discussed above, Enercorp filed suit within the limitations period for its claims for tortious interference and breach of contract.  Defendant has made no argument that allowing this action would work a grave injustice, and the Court finds no indication of any delay on the part of Enercorp in asserting its rights. Enercorp is therefore entitled to judgment as a matter of law as to Defendants' laches defense.

     5.   <u>Waiver</u>

"Waiver is the intentional relinquishment of a right actually known, or intentional conduct inconsistent with claiming that right." <u>Ulico Cas. Co.</u>, 262 S.W.3d at 778.  "The elements of waiver include (1) an existing right, benefit, or advantage held by a party; (2) the party's actual knowledge of its existence; and (3) the party's actual intent to relinquish the right, or intentional conduct inconsistent with the right." <u>Id.</u>  Defendants have offered no argument that Enercorp intentionally relinquished a known right or engaged in conduct inconsistent with the right, and no such evidence appears in the record. Additionally, the Collaboration Agreement provides that any waiver of a party's rights based on another party's breach of its obligations under the agreement shall not be deemed effective "unless in a writing signed by the Party entitled to the benefit of such performance."  (Ex. A-4, Dkt. # 105-1 ¶ 15(i).)  No written waiver

appears in the record.  Enercorp is therefore entitled to judgment as a matter of law as to Defendants' defense of waiver.

 6. Release

 "A release extinguishes a claim or cause of action and bars recovery on the released matter."  Stafford v. Allstate Life Ins. Co., 175 S.W.3d 537, 541 (Tex. App. 2005) (citing Dresser Indus., Inc. v. Page Petroleum, Inc., 853 S.W.2d 505, 508 (Tex. 1993)).  "To release a claim effectively, the releasing instrument must 'mention' the claim to be released."  Id. (citing Victoria Bank & Trust Co. v. Brady, 811 S.W.2d 931, 938 (Tex. 1991)).  "Any claims not 'clearly within the subject matter' of the release are not discharged, even if those claims exist when the release is executed."  Id.  The parties need not, however, anticipate and identify each potential cause of action relating to the subject matter of the release.  Keck, Mahin & Cate v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa., 20 S.W.3d 692, 698 (Tex. 2000).

 "A release is a contract subject to the rules of contract construction." In re J.P., 296 S.W.3d 830, 835 (Tex. App. 2009) (citing Williams v. Glash, 789 S.W.2d 261, 264 (Tex. 1990)).  "In construing a written contract, the primary concern of the court is to ascertain the true intentions of the parties as expressed in the instrument."  Valence Operating Co. v. Dorsett, 164 S.W.3d 656, 662 (Tex. 2005).  "[C]ourts should consider the entire writing in an effort to harmonize and

give effect to all the provisions of the contract so that none will be rendered

meaningless.  Contract terms are given their plain, ordinary, and generally

accepted meanings unless the contract itself shows them to be used in a technical

or different sense."  Id. (citation omitted).

   Enercorp argues that the release contained in the Collaboration

Agreement is limited to matters concerning lease title, and that its claims for

tortious interference with contract and breach of contract are therefore not covered

by the release.  (Dkt. #134 at 19.)  Defendants argue that Enercorp's claims of

tortious interference are based on Shapiro's conduct in asserting his rights to the

leases involved in the Collaboration Agreement, and are thus barred by the release.

(Dkt. # 131 at 16.)  The relevant provision, titled "Encumbrances Removed and

Released," states:

> Given the stated purpose of [SEPCO] to deal with the Leases on
> simplified terms and with a single contracting Party, and to promote
> the marketability of the Leases, the Parties acknowledge and agree
> that the simplification of matters of title to the Leases and the
> elimination of all encumbrances is essential.  To that end, each of the
> Parties does hereby release, relinquish, grant, transfer, assign and
> convey, each to the other, all liens, deeds, of trust, mortgages,
> assignments or production, security agreements, financing statements,
> claims, causes of action, notices of lis pendens, judgments, abstracts
> of judgment and any and all other encumbrances which one Party may
> claim against another with regard to title to the Leases.

(Ex. A-4, Dkt. # 105-1 ¶ 6 (emphasis added).)

The parties previously argued this issue on Defendants' Motion to Dismiss.  In its order rejecting Defendants' argument that this language barred Enercorp's claim for slander of title,[7] the Court found that the release distinguished between actions affecting title, which were released, and personal actions against a party for damages, which were retained.  (Dkt. # 37 at 13.)  Because the standard for dismissing a claim under Rule 12(b)(6) based on an affirmative defense requires that a successful defense "appear clearly on the face of the pleadings," Clark v. Amoco Prod. Co., 794 F.2d 967, 970 (5th Cir. 1986), the Court noted that "Defendants are at liberty to argue as part of a Motion for Summary Judgment that the Court's interpretation of the release is incorrect in light of other considerations," (Dkt. # 37 at 14).  Defendants have set forth no additional considerations, and their argument based on the language of the contract is unconvincing.

The plain language of Paragraph 6 limits the release to encumbrances on the leases covered by the Collaboration Agreement.  Its stated purpose is to clear title to and eliminate encumbrances on the leases to facilitate their sale to SEPCO.  Paragraph 7 of the Collaboration Agreement, regarding "Personal Claims Retained," adds further clarity to the scope of the release.  That provision states:

---

[7] Enercorp's cause of action for slander of title was dismissed without prejudice on other grounds.

> Notwithstanding the foregoing, each of the Parties retains and does not release, any claims or causes of action for damages, losses or monetary deficiencies that any Party may have against another Party, but with all such claims being of a personal nature against a Party, and not as a claim or encumbrance against the Leases or the lands included in the projects.

(Id. ¶ 7.)  Paragraphs 6 and 7 clearly distinguish between "encumbrances which one Party may claim against another with regard to title to the Leases," (id. ¶ 6 (emphasis added)) and any claims that are "of a personal nature against a Party, and not as a claim or encumbrance against the Leases or the lands included in the projects," (id. ¶ 7 (emphases added)).  The release thus applies to actions affecting title while reserving personal actions against a party for damages.

Enercorp's causes of action asserting tortious interference with contract are personal claims asserted against Defendants for damages.  See Raymond v. Yarrington, 73 S.W. 800, 803 (Tex. 1903); 47 Tex. Jur. 3d Interference with Contracts § 1.  The fact that the conduct complained of as tortious interference includes Defendants' acquisition of and assertion of rights to certain leases covered by the Collaboration Agreement does not render Enercorp's claims against Defendants for tortious interference "claim[s] or encumbrance[s] against the Leases."  Enercorp's claims do not assert title to or rights in the leases covered by the Collaboration Agreement, and are thus not barred by the release included in that agreement.  Enercorp is therefore entitled to judgment as a matter of law on Defendants' affirmative defense of release.

56

CONCLUSION

For the reasons given, the Court **DENIES AS MOOT** Defendants'

Motion for Leave to File Amended Answer (Dkt. # 92); and **DENIES** Defendants'

Motion for Summary Judgment (Dkt. # 88); and **GRANTS** Enercorp and Gates's

Amended Motion for Partial Summary Judgment (Dkt. # 134).

**IT IS SO ORDERED.**

**DATED:** San Antonio, Texas, March 24, 2015.

David Alan Ezra
Senior United States Distict Judge