UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | |
|---|---|
| U.S. ENERCORP, LTD., § <br>     Plaintiff, § <br> v. § <br> SDC MONTANA BAKKEN § <br> EXPLORATION, LLC; VAL VERDE § <br> INVESTMENTS, LLC; and RINGO § <br> SHAPIRO, § <br>     Defendants. § <br> §<br> SDC MONTANA BAKKEN § <br> EXPLORATION, LLC; VAL VERDE § <br> INVESTMENTS, LLC; and RINGO § <br> SHAPIRO, § <br>     Counter-Plaintiffs, § <br> v. § <br> U.S. ENERCORP, LTD., § <br>     Counter-Defendant. § <br> § <br> SDC MONTANA BAKKEN § <br> EXPLORATION, LLC; VAL VERDE § <br> INVESTMENTS, LLC; and RINGO § <br> SHAPIRO, § <br>     Third-Party Plaintiffs, § <br> v. § <br> BRUCE GATES, § <br>     Third-Party Defendant. § | No. SA:12-CV-1231-DAE |

ORDER GRANTING PLAINTIFF'S MOTION TO EXCLUDE THE REPORT
AND TESTIMONY OF ROBERT D. PULLIAM

1

Before the Court is a Motion to Exclude the Report and Testimony of Robert D. Pulliam filed by Plaintiff U.S. Enercorp, Ltd. ("Enercorp") (Dkt. # 117). Pursuant to Local Rule CV-7(h), the Court finds this matter suitable for disposition without a hearing. After careful consideration of the supporting and opposing memoranda, the Court, for the reasons that follow, **GRANTS** Plaintiff's Motion to Exclude the Report and Testimony of Robert D. Pulliam.

## BACKGROUND

I.    Factual Background

Enercorp is a Texas-based oil and gas exploration and production company. (Dkt. # 105 at 7.) Defendants Val Verde Investments, LLC ("Val Verde") and SDC Montana Bakken Exploration, LLC ("Bakken Exploration") are entities wholly owned and operated by Defendant Ringo Shapiro ("Shapiro"). On March 29, 2011, Enercorp entered into a contract with SDC Montana, LLC ("SDC Montana"), referred to herein as the "Acquisition Agreement," in order to acquire oil, gas, and mineral leases in Northern Montana. (Dkt. # 105-1 at 10.) Under that contract, Enercorp agreed to fund the acquisition of 15,000 acres of oil and gas leases within a specified area. (Id.) SDC Montana, a company owned by Christopher Dedmon ("Dedmon"), was to use the money provided by Enercorp to acquire leases in the designated area, record a recording memorandum, and finally execute a recordable assignment of the leases to Enercorp. (Id. at 10–11.)

2

On September 23, 2011, SDC Montana signed a series of agreements with Val Verde to address SDC Montana's capital shortfall and resulting inability to perform under the Acquisition Agreement with Enercorp.  ("Dedmon Dep.," Dkt. # 105-12 at 10:2–8; "Shapiro Dep.," Dkt. # 105-11 at 10:23–11:1.)  Under the agreements, Val Verde loaned $200,000 to SDC Montana in return for a security interest in the entirety of SDC Montana's property and assets.  (Dkt. # 105-4 at 2; Dkt. # 105-5 at 2.)  Additionally, SDC Montana engaged Val Verde as a consultant to assist in negotiating "revised/improved contracts with existing counterparties," as well as new contracts related to the sale of oil and gas leases.  (Dkt. # 105-7 at 2.)

On October 12, 2011, SDC Montana entered into an agreement with Bakken Exploration, referred to herein as the "Lease Facility Agreement."  (Dkt. # 105-2 at 2.)  The Lease Facility Agreement created an arrangement under which SDC Montana was to receive funds from Bakken Exploration, use the funds to acquire oil and gas leases, and assign the leases to Bakken Exploration.  In turn, Bakken Exploration agreed to retransfer the assigned leases to SDC Montana upon repayment of the funds used to acquire the leases.  (Id. ¶¶ A, 3.5, 4.1.)  While the parties offer competing characterizations of how the Lease Facility Agreement operated in practice, it is uncontested that SDC Montana assigned leases to Bakken Exploration that had been previously obligated or assigned to Enercorp under the

3

Acquisition Agreement. ("Shapiro Aff.," Dkt. # 89 ¶ 33.) It is also uncontested that Bakken Exploration recorded leases that had been previously assigned to and recorded by Enercorp. (Dkt. ## 105-1 at 22, 105-10 at 2; Dedmon Dep. 24:1–28:6.)

In late 2011, Enercorp became aware that Southwestern Energy Production Company ("SEPCO") was interested in acquiring a large quantity of leases in the area, and began negotiating a contract to sell its Montana leases to SEPCO. ("Gates Aff.," Dkt. # 105-1 at 4.) As negotiations between Enercorp and SEPCO progressed, Enercorp and SDC Montana orally agreed to divide the proceeds from the sale of leases to SEPCO on a 50–50 basis. ("Gates Dep.," Dkt. # 105-13 at 120:13–121:16; Dedmon Dep. at 54:12–55:13.) This arrangement is referred to herein as the "50–50 Agreement."

On March 9, 2012, Enercorp entered into an agreement with Bakken Exploration regarding the transfer of certain oil and gas leases between the two parties, referred to herein as the "Letter Agreement." (Ex. A-3, Dkt. # 105-1 at 25.) Under the Letter Agreement, Bakken Exploration agreed to assign 37 oil and gas leases to Enercorp, and Enercorp agreed to immediately assign back 30 of the 37 leases. (Id.) Both parties further agreed to negotiate in good faith to enter into an agreement, referred to as "the Collaboration Agreement," between themselves,

SDC Montana, and JL Resources, LLC ("JL Resources"),[1] regarding the sale of oil and gas leases to SEPCO. (Id.)

On March 14, 2012, SDC Montana entered into a contract with Bakken Exploration and Val Verde regarding the previous agreements the parties had entered into in September and October of 2011, referred to herein as the "Omnibus Agreement." (Dkt. # 89-4.) Under the Omnibus Agreement, which acknowledged that SDC Montana was in default under the previous agreements, Bakken Exploration and Val Verde conditioned their promise not to pursue the remedies under the previous agreements on SDC Montana assigning its interest in royalties generated by certain oil and gas leases to Bakken Exploration, the execution of the Collaboration Agreement, and the finalization and execution of the SEPCO contract. (Id. at 2–3.)

According to Dedmon, Shapiro held the leases that SDC Montana had assigned Val Verde under the Lease Facility Agreement "hostage until [Dedmon] signed the Omnibus Agreement," knowing the time-sensitive nature of the pending deal between SEPCO, SDC Montana, and Enercorp. (Dedmon Dep. 171:18–172:2.) Shapiro characterizes the Omnibus Agreement as "legally allow[ing] me to approve any deal that Dedmon made with the counterparties to the Collaboration Agreement," and states that the agreement gave him "a proverbial 'seat at the

---

[1] JL Resources is not party to this litigation.

table' in the negotiation of the Collaboration Agreement and ultimately the SEPCO [Contract]." (Shapiro Aff. ¶¶ 37–38.) On April 3, 2012, Shapiro sent an email to Gates, Enercorp's President and CEO, expressing that SDC Montana was "not in a position" to agree to the 50–50 Agreement that SDC Montana had previously made with Enercorp regarding anticipated revenues from the sale of leases to SEPCO. (Dkt. # 105-1 at 178.)

On April 13, 2012, Enercorp, SDC Montana, Val Verde, Bakken Exploration, and JL Resources entered into a contract referred to herein as the "Collaboration Agreement." (Ex. A-4, Dkt. # 105-1 at 1.) Under that agreement, all leases held by the parties in the relevant area of Montana were transferred, assigned, and quitclaimed to Enercorp. (Id. ¶¶ 1, 3, 6.) The Collaboration Agreement authorized Enercorp to conduct negotiations with SEPCO on behalf of the parties to the Agreement, and set out a schedule of payments that each party would receive upon consummation of the SEPCO deal. (Id. ¶¶ 8, 10.)

According to Enercorp, the purpose of the Collaboration Agreement "was to convey clear title to the Montana Leases to Enercorp, and to stop the Shapiro Entities' interference, so Enercorp could then finalize the contract for the sale of the Montana Leases to SEPCO." (Gates Aff. 5.) Gates states that "[t]he only reason the Shapiro Entities were included in the Collaboration Agreement was to obtain clear title to the Montana Leases that the Shapiro Entities had wrongfully

and fraudulently acquired from SDC Montana." (Id.) Shapiro, for his part, states that the contract addressed uncertainty in the chain of title of leases acquired by SDC Montana, created by "Dedmon's misconduct," and that the agreement allowed the parties to "maximize their returns." (Shapiro Dep. ¶ 43.)

Enercorp executed the contract with SEPCO to sell the Montana leases, referred to herein as the "SEPCO Contract," on May 1, 2012. (Ex. A-5, Dkt. # 105-1.) Pursuant to the Collaboration Agreement, Enercorp distributed to Defendants proceeds from the SEPCO Contract totaling $8,302,863.30.[2] (Ex. O-1, Dkt. # 105-15 at 5 & Exs. B, E.) Total proceeds from the SEPCO Contract came to over $69.5 million. (Id. at 4.)

II.     Procedural Background

Enercorp filed suit in the 166th Judicial District Court of Bexar County, Texas on November 19, 2012. (Dkt. # 1-2.) Defendants removed the action to this Court on December 31, 2012, invoking the Court's diversity jurisdiction. (Dkt. # 1.) On September 27, 2013, Defendants filed a third-party complaint asserting claims against Gates, Dedmon, Jack Gunther, SDC Montana, and SDC Montana Consulting, LLC, as well as counterclaims against Enercorp. (Dkt. # 40.) Specifically, Defendants asserted causes of action for breach of

---

[2] The Court's March 24, 2015 Order (Dkt. # 142) misstated this figure due to the omission of the proceeds paid to Defendants pursuant to Phases 2 and 3 of the contract.

contract, accounting, and breach of fiduciary duty against Enercorp; for fraud against Enercorp and Gates; for fraudulent inducement against Enercorp, Gates, SDC Montana, and Dedmon; and for civil conspiracy to commit fraud against Enercorp, Gates, and Gunther.  (Id. at 14–23.)

Defendants filed a Motion for Summary Judgment and supporting exhibits on July 1, 2014.  (Dkt. ## 88–90.)  Enercorp and Third-Party Defendant Bruce Gates filed an Amended Motion for Partial Summary Judgment and supporting exhibits on January 28, 2015.  (Dkt. # 134.)  At the hearing on the motions, the Court granted Enercorp leave to amend its complaint, and Enercorp filed a Second Amended Complaint on March 11, 2015.  (Dkt. #141.)  On March 24, 2015, the Court issued an Order denying Defendants' motion for summary judgment and granting Enercorp and Gates's amended motion for partial summary judgment.  (Dkt. # 142.)

Enercorp filed the instant Motion to Exclude the Opinion and Testimony of Robert D. Pulliam on December 2, 2014.  (Dkt. # 117.)  Defendants filed a Response on December 16, 2014 (Dkt. # 121), and Enercorp subsequently filed a Reply (Dkt. # 123).  The Court has withheld a ruling on the Motion based on the parties' representations that they were working toward settlement.  Such settlement has yet to come to fruition, and the Court will not further delay its ruling.

LEGAL STANDARD

Federal Rule of Evidence 702 provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

   a. the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
   b. the testimony is based on sufficient facts or data;
   c. the testimony is the product of reliable principles and methods;
   d. the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  This rule lays responsibility on the court to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." Daubert v. Merrill Dow Pharm., Inc., 509 U.S. 579, 589 (1993).

"Before a district court may allow a witness to testify as an expert, it must be assured that the proffered witness is qualified to testify by virtue of his 'knowledge, skill, experience, training, or education.'" United States v. Cooks, 589 F.3d 173, 179 (5th Cir. 2009) (quoting Fed. R. Evid. 702).  "A district court should refuse to allow an expert witness to testify if it finds that the witness is not qualified to testify in a particular field or on a given subject." Id.

To determine whether testimony is reliable, the court must assess whether the reasoning or methodology underlying the testimony is scientifically

valid. Moore v. Ashland Chem. Inc., 151 F.3d 269, 276 (5th Cir. 1998) (en banc). Courts consider five non-exclusive factors in making this determination: (1) whether the expert's theory or technique can be or has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error of the challenged method; (4) the existence and maintenance of standards controlling the technique's operation; and (5) whether the theory or technique is generally accepted in the relevant scientific community. Daubert, 509 U.S. at 593–94. In evaluating these factors, the court must focus on the expert's "principles and methodology, not on the conclusions" generated. Id. at 594.

  The party seeking admission of expert testimony must show the testimony is reliable by a preponderance of the evidence. Moore, 151 F.3d at 276. "This requires some objective, independent validation of the expert's methodology." Id. "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." Pipitone v. Biomatrix, Inc., 288 F.3d 239, 250 (5th Cir. 2002) (quoting Daubert, 509 U.S. at 596).

  "In addition to being reliable, expert testimony must 'help the trier of fact to understand the evidence or to determine a fact in issue.'" Roman v.

Western Mfg., Inc., 691 F.3d 686, 694 (5th Cir. 2012) (citing Fed. R. Evid. 702(a)).  Under Rule 702, this means that the proffered expert testimony must be relevant.  Id.  "Expert testimony which does not relate to any issue in the case is not relevant, and ergo, non-helpful."  Id. (quoting Daubert, 509 U.S. at 591 (internal quotation marks and citations omitted)).

## DISCUSSION

Defendants intend to offer Pulliam's report to rebut the report of Enercorp's expert Steven Fowler ("Fowler"), which calculated Enercorp's damages resulting from Defendants' alleged tortious interference at $4,774,431. (Dkt. # 117-5 at 9.)  Fowler used as his measure of damages the amount of proceeds from the SEPCO Contract allocated to Defendants under the Collaboration Agreement that would have been allocable to Enercorp if Defendants had not participated in Collaboration Agreement.  (Id. at 4.)  Pulliam's report, by contrast, uses the terms of the Acquisition Agreement between Enercorp and SDC Montana to determine how much Enercorp would have received from the SEPCO Contract.  (Dkt. # 117-6 at 5.)  Pulliam concludes that Enercorp actually received more from the SEPCO Contract under the terms of the Collaboration Agreement than it would have under the Acquisition Agreement, and that Enercorp therefore suffered no damages.  (Id. at 6.)

11

Plaintiff argues that Pulliam's report and opinions should be excluded in their entirety because they are irrelevant and unreliable. (Dkt. # 117 at 3.) Specifically, Plaintiff argues that Pulliam used an improper measure of loss to calculate the damages resulting from Shapiro's alleged tortious interference with Plaintiff's contracts, and that his opinions will therefore not assist the trier of fact. (Id. at 3–5.) Plaintiff further argues that Pulliam's opinions are unreliable because they failed to account for the full value of Plaintiff's contract with SEPCO and did not consider the market price of oil at the time the SEPCO contract was executed. (Id. at 5–7.)

    A.    Relevance

"In Texas, tortious interference with contract and breach of contract typically share the same measure of damages: to place the injured party in the position he would have been had the contract been performed." Homoki v. Conversion Servs., Inc., 717 F.3d 388, 398 (5th Cir. 2013) (citing Am. Nat'l Petroleum Co. v. Transcon. Gas Pipe Line Co., 798 S.W.2d 274, 278 (Tex. 1990)). However, damages for tortious interference also include any damages "proximately caused by the act of interference." Id. at 404.

Enercorp's Second Amended Complaint alleges that Defendants interfered with three contracts: (1) the Acquisition Agreement between Enercorp and SDC Montana, (2) the 50–50 Agreement between Enercorp and SDC

Montana, and (3) the SEPCO Contract.  (Dkt. # 141.)  Pulliam's analysis does not clearly distinguish between Enercorp's tortious interference claims, but appears to only cover the damages arising out of Defendants' alleged interference with the Acquisition Agreement and the 50–50 Agreement.

Under the Acquisition Agreement, SDC Montana was responsible for obtaining and recording 15,000 oil and gas leases within a certain area on behalf of Enercorp, which agreed to fund the acquisition of the leases at a price of $750 per mineral acre.  (Dkt. # 117-1 at 1.)  Enercorp was to obtain a 100% working interest and a 79% net revenue interest in the leases acquired, and a 5% net equity interest in all other oil and gas leases that SDC Montana acquired outside of the contract area.  (Id.)  An amendment to the Agreement executed on December 31, 2011, clarified that SDC Montana would receive up to 21% of the net royalty interest in the leases.  (Id. at 10.)  The amendment further provided that if Enercorp sold any of the leases acquired by SDC Montana before December 31, 2012, Enercorp would pay SDC Montana $600 per acre for each acre sold, "less a pro rata portion of the $3,800,000 purchase price paid by [Enercorp] for the entire 15,000-acre Project, to be allocated to the Leases included in the sale based on the net acreage included therein, and proportionately reduced to any interest sold which is less than one hundred percent (100%) working interest in such leases."  (Id.)  If SDC

Montana failed to assign 15,000 acres to Enercorp before December 31, 2012, however, the compensation to SDC Montana per acre sold would be $350.  (Id.)

Enercorp alleges that Defendants tortiously interfered with the Acquisition Agreement by causing SDC Montana to assign leases to Defendants that were obligated to Enercorp, and that as a result SDC Montana breached the Agreement by failing to assign all of the contracted-for leases to Enercorp.  (Dkt. # 141 ¶ 26.)  The contract damages for Defendants' alleged tortious interference with the Acquisition Agreement and its amendment are measured by the difference in value, at the time of breach, of the leases that SDC Montana assigned to Enercorp prior to breaching the contract and the value of the leases that SDC Montana was required to deliver under the terms of the Agreement.  See Qaddura v. Indo-European Foods, Inc., 141 S.W.3d 882, 888–89 (Tex. App. 2004) (stating that expectation damages seek to restore the non-breaching party to the same economic position in which it would have been if the contract had not been breached).  Enercorp also alleges, however, that Defendants' tortious interference with the Acquisition Agreement forced Enercorp to include Defendants in the Collaboration Agreement, which allowed Defendants to receive proceeds from the SEPCO Contract that otherwise would have gone to Enercorp.  (Dkt. # 141 ¶ 15.)  Such a loss would be recoverable if proximately caused by Defendants' interference.  See Homoki, 717 F.3d at 404.

Enercorp further alleges that Defendants' tortious interference caused SDC Montana to breach the 50–50 Agreement, under which Enercorp and SDC Montana agreed to evenly split the proceeds from the SEPCO Contract after compensation paid to JL Resources.  Enercorp alleges that it included Defendants in the subsequent Collaboration Agreement in order to mitigate the damages resulting from Defendants' interference, which had clouded title to certain leases that Enercorp intended to sell to SEPCO.  (Dkt. # 141 ¶ 15); see also Formosa Plastics Corp., USA v. Kajima Int'l, Inc., 216 S.W.3d 436, 458 (Tex. App. 2006) (noting that a plaintiff has duty to mitigate damages).  Because the Collaboration Agreement contained less favorable terms than the 50–50 Agreement breached by SDC Montana, Enercorp alleges that Defendants' interference with the 50–50 Agreement caused it to suffer a loss.  (Id. ¶ 19.)  The measure of Enercorp's damages due to SDC Montana's breach of the 50–50 Agreement would thus be the difference between the proceeds it would have received from the SEPCO Contract under the terms of the 50–50 Agreement and the proceeds it in fact received under the Collaboration Agreement.

Pulliam's analysis does not specify to which claims it applies, and measures Enercorp's damages by taking the difference between the proceeds Enercorp received from the SEPCO Contract under the terms of the Collaboration Agreement and the amount Enercorp would have received from the SEPCO

Contract under the terms of the Acquisition Agreement.  The Court first notes that this measure cannot include Enercorp's damages arising from the alleged breach of the 50–50 Agreement, as it does not take into account Enercorp's expectation with respect to its receipt of proceeds from the SEPCO Contract under that agreement.  Pulliam's analysis can thus at most measure the amount of Enercorp's damages proximately caused by Defendants' alleged tortious interference with the Acquisition Agreement.

Pulliam's analysis, however, uses a legally incorrect basis for determining Enercorp's damages associated with Defendants' alleged tortious interference with the Acquisition Agreement.  As noted above, Enercorp's allegation is that Defendants would not have been included in the Collaboration Agreement except for their tortious interference with the Acquisition Agreement, and that Enercorp received fewer proceeds from the SEPCO Contract as a result of Defendants' inclusion in the Collaboration Agreement.  If Enercorp is able to substantiate that allegation, the correct measure of damages would be the amount of proceeds that Enercorp would have received from the SEPCO Contract under the Collaboration Agreement if Defendants had not participated in the Collaboration Agreement, to which they were a party only because of their prior tortious interference.  Pulliam's use of the terms of a different contract as the basis

for determining Enercorp's damages thus fails to address the harm resulting from the conduct alleged by Enercorp.

The Court further notes that Pulliam's use of the Acquisition Agreement is unsupported by the record in this case. The final amendment to the Acquisition Agreement was executed on December 31, 2011. (Dkt. # 117-1 at 12.) The Collaboration Agreement was executed on April 13, 2012, and expressly provided that the Acquisition Agreement was terminated and "deemed to have been replaced and superseded" by the provisions of the Collaboration Agreement. (Dkt. #134-1, Ex. A-4 at 12.) There is no indication in the record, and Pulliam testified that he did not assume in his analysis, that the Collaboration Agreement would not have existed absent Defendants' alleged tortious interference.[3] (Dkt. # 117-7 at 99:8–13.) Pulliam's report provides no explanation or justification for why he used the terms of the Acquisition Agreement as the basis from which to measure the harm to Enercorp resulting from Defendants' inclusion in the Collaboration Agreement, or for ignoring the existence of a subsequently executed contract whose terms expressly superseded those of the agreement he used as the basis for his damages calculation.

---

[3] Shapiro attests that his contracts with SDC Montana gave him "a proverbial 'seat at the table' in the negotiation of the Collaboration Agreement and ultimately the SEPCO [Contract]," indicating that an agreement allocating the SEPCO Contract proceeds was already contemplated by Enercorp, SDC Montana, and JL Resources. (Shapiro Aff. ¶¶ 37–38.)

The Court therefore finds no reasonable basis for Pulliam's assumption that the Acquisition Agreement, rather than the Collaboration Agreement, would have governed the allocation of proceeds under the SEPCO Contract absent Defendants' alleged interference. Because Pulliam's analysis uses an incorrect basis for calculating the damages proximately caused by Defendants' alleged tortious interference with the Acquisition Agreement, his opinion regarding Enercorp's damages will not assist the trier of fact.

B.   Reliability

While the Court's finding with regard to the relevance of Pulliam's analysis is sufficient to exclude his report and testimony under Federal Rule of Evidence 702, the Court will also briefly discuss the reliability of Pulliam's analysis as an alternative basis for exclusion. Enercorp argues that even if the terms of the Acquisition Agreement were a proper basis on which to calculate Enercorp's damages, Pulliam's analysis understates the harm to Enercorp by failing to take into account the proceeds received under Phases 2 and 3 of the SEPCO Contract. (Dkt. # 117 at 7.)

Phase 1 of the SEPCO Contract involved the sale of leases presently owned by Enercorp. Phases 2 and 3 contemplated the further acquisition of leases by Enercorp for transfer to SEPCO and included option exercise prices and success fees upon successful development of the oil and gas resources. (See Dkt. # 134-1,

18

Ex. A-4 at 3; Dkt. # 117-8 at 1–4, 6–8.) Pulliam's calculation includes only those damages incurred by Enercorp "for the existing leases that were contributed to the Collaboration Agreement" covered under Phase 1. (Dkt. # 117-6 at 5.) Under the terms of the Collaboration Agreement, however, Enercorp and Defendants also received proceeds from Phases 2 and 3 of the SEPCO Contract. (Dkt. # 134-1, Ex. A-4 at 6–9.) Because Enercorp's claim for tortious interference with the Acquisition Agreement alleges that Defendants would not have been included in the Collaboration Agreement absent their interference, Enercorp's damages for this claim would include all proceeds received by Defendants under the Collaboration Agreement that would have been allocable to Enercorp absent Defendants' participation in that Agreement. Pulliam's failure to include Defendants' Phase 2 and 3 proceeds in his measure of damages thus results in an incomplete accounting of the alleged harm.

Finally, Pulliam's calculation also appears to ignore, without explanation, certain provisions of the Acquisition Agreement on which it is based. As noted above, the Acquisition Agreement provided that Enercorp would pay SDC Montana $600 per acre for all leases acquired by SDC Montana that Enercorp sold before December 31, 2012, "less a pro rata portion of the $3,800,000 purchase price paid by [Enercorp] for the entire 15,000-acre Project, to be allocated to the Leases included in the sale based on the net acreage included therein, and

19

proportionately reduced to any interest sold which is less than one hundred percent (100%) working interest in such leases." (Dkt. # 117-1 at 10.) Pulliam's report does not discuss, and does not calculate, the pro rata portion of the project's purchase price that would be subtracted from the amount paid to SDC Montana under the terms of the Acquisition Agreement. Pulliam's report further fails to explain why it did not use the alternative $350 per acre price that would apply if SDC Montana failed to assign a total of 15,000 acres to Enercorp by the end of 2012. Given that Enercorp only had 12,268 acres of leases at the time it executed the SEPCO Contract on May 1, 2012—a figure Pulliam used in his own calculation—it appears at least possible that SDC Montana would not have been able to reach the 15,000 acre total by the December 31 deadline.

The Court therefore finds that Pulliam's analysis of Enercorp's damages is not reliable and should be excluded on this basis as well.

## CONCLUSION

For the foregoing reasons, the Court **GRANTS** Enercorp's Motion to Exclude the Report and Testimony of Robert D. Pulliam (Dkt. # 117).

**IT IS SO ORDERED.**

**DATED:** San Antonio, Texas, September 30, 2015.

_____
David Alan Ezra
Senior United States Distict Judge